**In the Matter of the Application for the Discipline of John T. FINLEY, an Attorney at Law of the State of Minnesota.**

**No. 47365.**

Supreme Court of Minnesota.

Jan. 20, 1978.

R. Walter Bachman, Jr., Administrative Director on Professional Conduct, St. Paul, for appellant.

Joseph J. Dudley, M. J. Galvin, Jr., St. Paul, for respondent.

PER CURIAM.

The Administrative Director on Professional Conduct, at the direction of the Lawyers Professional Responsibility Board, has filed with the court six complaints against John T. Finley, an attorney at law, alleging professional misconduct and seeking appropriate disciplinary action. Respondent Finley has interposed an answer asserting by way of defense that no party, individual, or municipality has been injured or harmed by his acts and asserts that no more than a private reprimand is warranted. The matter was referred to the Honorable Clarence A. Rolloff, Judge of the District Court (Retired), who conducted a hearing and on October 25, 1977, filed with the court Find-

ings and Conclusions, and recommended a public censure of respondent Finley. The findings of the Referee are not disputed and counsel for respondent has waived the right to file briefs and present oral argument to the court. The pertinent portions of the Referee's Findings and Conclusions are as follows:

"On July 25, 1975, Respondent was charged by the St. Paul City Attorney with five separate counts of false certification by a notary public, violations of Minn.Stat. 609.65(2). The false notarizations came to light during an investigation by the St. Paul City Attorney into theft and illegal bingo operations in connection with licensed bingo games in St. Paul. Pursuant to Minn.Stat. 609.65(2), each count of false certification was a misdemeanor punishable by ninety days in jail and/or a $300.00 fine. On July 22, 1976, Respondent pled guilty in Ramsey County Municipal Court to two counts of false certification, and the other three counts were dismissed. Respondent received deferred sentences under Minn. Stat. 609.135, on condition of payment of a $100.00 fine on each of the two counts. On January 20, 1977, the two counts of false certification were dismissed, the conditions of the deferred sentences having been met.

\* \* \* \* \* \*

"On three separate occasions between August 4, 1972 and January 3, 1973, Respondent, while acting in his capacity as a notary public, falsely certified that documents entitled "Information Required with Application for Permit to Conduct Bingo Game in St. Paul", also known as "Bingo Information Sheets", were subscribed and sworn to in his presence by persons whose signatures were required to be notarized on the sheets. In total, Respondent falsely notarized four Bingo Information Sheets.

"The Bingo Information Sheets comprised part of the application submitted by non-profit corporations for permits to

conduct bingo games. The Bingo Information Sheets were required to be signed by both an officer of the organization and by the manager in charge of the games. Under St. Paul City Ordinance Chapter 410.04, the Bingo Information Sheets were required to be signed and verified by oath by the person conducting, operating and managing the game, and were required to be filed with the St. Paul City License Inspector. * * * These Sheets contained names of club officers, bingo game managers, and custodians of organizational records. The Sheets stated the purposes of the organizations, how long they had been in existence, whether they carried liability insurance, and related information. The person who purportedly signed each Sheet stated that he or she had read and thoroughly understood the provisions of all laws, ordinances and regulations governing the operation of bingo games. The Sheets further listed any other bingo games in which the manager was involved, either directly or indirectly.

"On each occasion, the Bingo Information Sheets were delivered to Respondent at his law office by Leonard Vannelli. Mr. Vannelli was a high school classmate, close friend, neighbor, business associate, and client of Respondent. * * *

"Mr. Vannelli testified at his deposition that from about 1965 through 1974, he assisted in organizing or supervising the bingo operations for nine separate organizations in the City of St. Paul. * * *

"In each case, Respondent notarized the Bingo Information Sheets in reliance upon Mr. Vannelli's statements that the contents were true and in proper order, and that the signatures were genuine. * * * Respondent relied on these statements when he notarized the documents.

"The first false notarization is set forth in Complaint No. 1 of the Petition for Disciplinary Action. On or about January 2, 1973, while acting in his official

capacity as a notary public, Respondent falsely certified that a Bingo Information Sheet was subscribed and sworn to in his presence by one George Maser. * * * George Maser did not appear before Respondent and sign the Bingo Information Sheet, did not authorize anyone else to sign his name, and was not aware that his signature had been placed on the Sheet. * * * Mr. Maser signed an affidavit * * * dated August 13, 1975, in which he stated that he had signed the Bingo Information Sheet in question and had requested Mr. Leonard Vannelli to file the same after first having the Sheet notarized. Mr. Maser was shown this affidavit during his deposition, and he repudiated it, stating that he could not recollect signing the affidavit, that he had never signed the Bingo Information Sheet, and that he had never requested anyone to sign his name to the Sheet and have it notarized. * * * Mr. Maser's affidavit does not reflect the facts regarding the notarization of his purported signature on the Bingo Information Sheet. The true facts are reflected in Mr. Maser's deposition testimony, in which he testified that he neither signed the Bingo Information Sheet nor requested anyone to sign his name and notarize it. The Bingo Information Sheet stated that George Maser was the "Manager in Charge of Game" for the Eagles Club. Although Mr. Maser was in charge of the Eagles Club games in the fall and winter of 1973, he never agreed to be the manager, nor was he aware that he was identified in that capacity on the Bingo Information Sheet. * * * Mr. Maser had cleaned the Respondent's carpet in 1971, and had been to Respondent's office regarding an unrelated matter when Respondent was representing the Moose Lodge, of which Mr. Maser was a member. * * *

"The second false notarization is set forth in Complaint No. 2 of the Petition for Disciplinary Action. On or about January 2, 1973, while acting in his offi-

cial capacity as a notary public, Respondent falsely certified that a Bingo Information Sheet was subscribed and sworn to in his presence by one Jay Anderson. * * * Jay Anderson did not appear before Respondent and did not sign the Bingo Information Sheet, did not authorize anyone else to sign his name, and was not aware that his signature had been placed on the Sheet. * * * The Bingo Information Sheet indicated that Jay Anderson was the "Manager in Charge" of the St. Paul Eagles Athletic Fund Bingo games. In fact, Mr. Anderson never agreed to be the manager, and was not aware that he was identified in that capacity. * * * Jay Anderson and Respondent have never met. * * However, Respondent was acquainted with Mr. Anderson's name through his work as a minor official for the Minnesota Fighting Saints Hockey Team during 1972. * * *

"The third false notarization is set forth in Complaint No. 4 of the Petition for Disciplinary Action. On or about December 29, 1972, while acting in his official capacity as a notary public, Respondent falsely certified that a Bingo Information Sheet was subscribed and sworn to in his presence by one James B. Gillespie * * *. James B. Gillespie did not sign the Bingo Information Sheet and did not appear before Respondent to swear to or acknowledge his signature on the Sheet. To the best of Petitioner's and Respondent's knowledge, Respondent notarized the Bingo Information Sheet prior to Mr. Gillespie's signature being placed on it, at a time when it contained the signature of Gloria McClellan. Respondent thought he was notarizing Gloria McClellan's signature. However, Gloria McClellan was not present when Respondent notarized the Bingo Information Sheet in question. Further, James B. Gillespie's name appeared on the Bingo Information Sheet as "Manager in Charge of Game", the person whose signature was required to be notarized. * *

The fact that James B. Gillespie signed an affidavit * * * in which he stated that he authorized someone else to sign and notarize his name is irrelevant, since . Respondent has testified in his deposition that he thought he was notarizing the signature of Gloria McClellan and that Mr. Gillespie's signature was not present on the Bingo Information Sheet at the time that he notarized it. * * * Respondent knew who James B. Gillespie was, since the latter was a former athlete at Respondent's high school alma mater. * * *

"The fourth false notarization is set forth in Complaint No. 5 of the Petition for Disciplinary Action. On or about August 4, 1972, while acting in his official capacity as notary public, Respondent falsely certified that a Bingo Information Sheet was subscribed and sworn to in his presence by one Clifford F. LaValla. * * Clifford F. LaValla signed the original Bingo Information Sheet. However, the Bingo Information Sheet notarized by Respondent was a photocopy, and bore a photocopy of the signature of Mr. LaValla. * * * Mr. LaValla did not sign the Bingo Information Sheet in Respondent's presence and did not authorize Leonard Vannelli to have his signature notarized. * * * Mr. LaValla was manager of the Como Gopher Club bingo games for three or four years, including the year in which Respondent notarized his signature. * * * Mr. LaValla has never met Respondent and did not know who he was until sometime after August 4, 1972. Although Respondent did know know (sic) Mr. LaValla, he has seen his signature on various letters to Respondent, written in his capacity as Manager of the Como Gopher Club bingo operation. * * *

* * * * * *

"Respondent had no intent to defraud and was unaware of the inaccuracies or forgeries in the Information Sheets and was not involved in the operation of any

Bingo game. No party suffered any pecuniary loss as a result of Respondent's false certifications. Respondent has been cooperative in these proceedings. There are no other claims of unethical conduct contained in the confidential files of the Lawyer's Professional Responsibility Board.

"CONCLUSIONS

"1. Respondent falsely notarized four Bingo Information Sheets not signed in his presence, relying solely on the assurances of a friend and business associate that the Information Sheets were accurate and in proper order. Respondent solely notarized four Bingo Information Sheets and acknowledged that the persons whose signatures appeared on the Information Sheets signed the documents in his presence when, in fact, none of those who signed the Information Sheets appeared before Respondent at the time Respondent notarized the documents. He relied solely on the assurances of a friend and business associate that the Information Sheets were accurate and in proper order.

"2. Each false notarization by Respondent violated the provisions of Minn.Stat., Sec. 609.65(2), a misdemeanor, and each violation was illegal conduct but did not involve moral turpitude.

"3. Respondent had no personal knowledge of any facts which would have led him to a reasonable belief that the persons who purportedly signed the Information Sheets actually did so. Respondent failed to take sufficient steps to independently verify the genuineness of the signatures he notarized. Respondent was barely acquainted with only two of the four persons, and had seen the signature of only one of them prior to notarizing it.

"4. In two cases (Maser and Anderson), the signatures were forged without the consent of the purported signators. In a third case (Gillespie), the proper signature was missing when the document

was notarized, and a forged signature was later supplied to the form.

"5. The Bingo Information Sheets were required by ordinance to be notarized and comprised part of the applications to conduct weekly bingo games over an extended period of time, giving the applicants the right to handle large amounts of money. Respondent should have been alerted to the public purposes sought to be achieved by the notarization requirement and to the risks of fraud and the need for accuracy in the applications. At least two of the persons who purported signatures were notarized by Respondent would not have authorized the use of their name on the application form, and the content of the purportedly verified public applications was, therefore, false.

"6. Respondent, by signing his name in purported verification of signatures, false stated that those signatures were 'subscribed and sworn to' before him on certain dates. In fact, the signatures were neither subscribed nor sworn to in Respondent's presence on any date, and Respondent's false notarizations under these circumstances constituted misrepresentations in a document known by Respondent to be for public purposes, contrary to DR 1–102(A)(4), (5), and (6)."

The respondent Finley asserts by way of justification for his conduct that "it was a customary practice for a notary public to, when circumstances warranted, acknowledge documents in blank or acknowledge the documents when the person whose signature is being acknowledged is not present and there was reasonable cause to believe that the procedure was authorized by the party whose acknowledgement was being taken. The conduct of the respondent in this instance did not vary in material part from the practice of the community as a whole." We categorically reject this defense for two reasons; First, there is no evidence of a widespread violation of Minn.St. 609.65(2) under which imprison-

ment for up to 90 days is authorized for falsely certifying an acknowledgement. Nor do we take judicial notice of such pervasive violations of the statute. More important, members of the bar are held to a higher standard of morality than the public generally. They take an oath to conduct themselves in an upright manner and to "use no falsehood or deceit." Minn.St. 358.-07, subd. 9. In falsely representing to the city that the persons whose acknowledgements he certified had personally appeared before him, he violated his professional oath and made possible three acts of forgery. We strongly condemn such behavior and publicly censure respondent for willfully and intentionally executing false certificates.

Similar violations by members of the bar in future cases may well be dealt with more severely. However, this appears to be a case of first impression and the Referee has found that respondent had no intent to defraud, was unaware of the forgeries, has been cooperative in these proceedings, and otherwise has an unblemished record. Accordingly, the sanction of public censure is deemed adequate but should not necessarily be construed as a precedent in all future cases.