Inquiry into the CONDUCT OF
the Honorable Harvey C.
GINSBERG.

No. A03–1336.

Supreme Court of Minnesota.

Dec. 27, 2004.

Douglas A. Kelley, Steven Eugene Wolter, Douglas A. Kelley, P.A., Minneapolis, MN, for Bd. on Judicial Standards, relator/appellant.

Mark W. Gehan, Collins, Buckley, Sauntry & Haugh, P.L.L.P., St. Paul, MN, for Harvey C. Ginsberg, respondent.

Kenneth L. Jorgensen, Director, Timothy M. Burke, Senior Asst. Director, Julie E. Bennett, Asst. Director, St. Paul, MN, for Office of Lawyers Professional Responsibility, respondent.

## O P I N I O N

### PER CURIAM.

This judicial discipline proceeding arises from three Formal Statements of Complaint filed by the Board on Judicial Standards (Board) under Rule 8(a)(1), Rules of Board on Judicial Standards,[1] against respondent Harvey C. Ginsberg, Judge of the Fourth Judicial District. Two of the complaints allege misconduct in violation of the Code of Judicial Conduct and the Board's Rules. The third complaint alleges a mental condition that seriously interferes with the performance of Judge Ginsberg's official duties. We order Judge Ginsberg's removal from judicial office for misconduct and his disability retirement, as well as suspension of his license to practice law for a period of one year from the date of this opinion with transfer to disability inactive status following the suspension.

### PROCEDURAL HISTORY

Judge Harvey C. Ginsberg took office as a district court judge in January 1991. He was elected in 1992 and reelected in 1998. Judge Ginsberg did not seek reelection in November 2004, and his current term expires on January 3, 2005.

In June 2003, Judge Ginsberg was placed on medical leave from his judicial duties. He has not performed any duties as a judge since that time. In September 2003, Judge Ginsberg applied to Governor Tim Pawlenty for disability retirement under Minn.Stat. § 490.101, subd. 2 (2002). To date, no action has been taken on that application.

The Board initiated this proceeding on September 15, 2003, when it filed with this court a Formal Statement of Complaint (Complaint I) that it had served on Judge Ginsberg on August 22, 2003. The complaint alleged that Judge Ginsberg's conduct violated various provisions of the Code of Judicial Conduct (Code) and the Rules of the Board. Along with the complaint, in accordance with Rule 8(a)(3), the Board filed Judge Ginsberg's written response to the complaint in which he denied some of the facts alleged and denied that his conduct violated the Code or the Rules. Pursuant to Rule 10(a), on September 24, 2003, a three-member panel was appointed to conduct a public hearing on the charges in the complaint and to make findings and recommendations to the Board.[2]

In the course of its prehearing proceedings, the Factfinding Panel determined that Judge Ginsberg had put his mental condition in issue. Therefore, under Rules 15(b) and 15(c)(2), the Factfinding Panel appointed counsel for Judge Ginsberg and authorized an independent medical examination concerning his mental condition. This examination occurred on December 22, 2003, but the examining forensic psychiatrist terminated the examination after approximately 15 minutes because of her concern that the examination itself could be detrimental to Judge Ginsberg's mental health and that Judge Ginsberg needed to be hospitalized. The psychiatrist informed the Board of her opinion that Judge Ginsberg was not capable of assisting in his defense due to his mental condition.

On January 22, 2004, the Board filed a second Formal Statement of Complaint (Complaint II), Judge Ginsberg's second

---

1. Unless otherwise indicated, all citations to Rules in this opinion are to the Rules of the Board on Judicial Standards.

2. The panel members were retired Supreme Court Justice Edward C. Stringer, retired District Court Judge Ancy L. Morse, and Thomas H. Swain. We thank the panel members for their willingness to serve and for their work on this difficult matter.

response, and Findings and Recommendations of the Board. Complaint II alleged that Judge Ginsberg suffered from a mental condition that seriously interfered with the performance of his official duties and was or was likely to become permanent. Judge Ginsberg's response admitted the factual allegations and conclusion in Complaint II. The Board recommended that Judge Ginsberg be retired on the basis of mental disability. On January 21, 2004, the Factfinding Panel suspended its proceedings pending this court's action on the Board's recommendation of disability retirement.

In February 2004, it was reported that Judge Ginsberg had been or was about to be charged with a felony arising from a confrontation in a parking lot.[3] By order filed May 4, 2004, we stayed proceedings in this court and remanded the matter to the Board under Rule 13(d)(1), for a hearing and factual findings on:

(1) the merits of the Formal Statement of Complaint filed September 15, 2003; (2) the existence of a disability; and (3) the existence of a causal connection, if any, between the alleged disability and the misconduct alleged in the Formal Statement of Complaint filed September 15, 2003, and, if appropriate, any other alleged misconduct by respondent that may have occurred up to the date of this order.

The order set a June 2, 2004, deadline for filing of findings of fact. A status conference was then requested by the parties, which took place on June 3, 2004. Following this conference, we vacated our May 4 order in part and ordered that: "[t]he Board and the panel shall proceed as expeditiously as possible consistent with the Rules of the Board on Judicial Standards and due process to present this court with panel findings of fact and a Board recommendation for resolution of the complaints at issue in this matter."

Also on June 3, 2004, the Board on Judicial Standards filed the third Formal Statement of Complaint in this matter (Complaint III), accompanied by the Answer of Respondent to the complaint. Complaint III alleged that a criminal complaint had been filed in Hennepin County against respondent, alleging that there was probable cause to believe that respondent committed a felony, specifically Criminal Damage to Property in the First Degree.

On June 7, 2004, we issued an order to show cause why Judge Ginsberg should not be suspended under Rule 14(a), based on the filing of a felony charge against him. Judge Ginsberg did not respond to the order to show cause, and by order filed June 15, 2004, we suspended Judge Ginsberg with pay and referred all three pending Board complaints to the Factfinding Panel for hearing and findings.

The Factfinding Panel held a public hearing on August 9 and 10, 2004. Because Judge Ginsberg, in his responses to the Board's requests for admissions, admitted the alleged conduct, the hearing focused on the issues of disability and the causal connection between the disability and conduct.[4]

---

**3.** When a judge is charged with a felony, Rule 14(a) authorizes the court to suspend him with pay. Upon conviction, the rule authorizes the court to suspend the pay of the judge pending completion of disciplinary proceedings.

**4.** The following expert witnesses testified at the hearing: Dr. Karen Bruggemeyer, M.D.,

Board-certified psychiatrist, who conducted Judge Ginsberg's independent medical examination for the Board on Judicial Standards; Dr. Gregory Hanson, Ph.D., licensed psychologist, who administered psychological tests as part of the independent medical examination; Dr. Ronald D. Groat, M.D., Board-certified psychiatrist, who is Judge Ginsberg's primary treating psychiatrist; and Dr. Harry Hober-

On October 1, 2004, the Factfinding Panel filed its findings and recommendations with the Board on Judicial Standards. The Factfinding Panel concluded that the conduct alleged in the complaints and admitted by Judge Ginsberg violated the Code and the Rules and was grounds for discipline. The Factfinding Panel also concluded that Judge Ginsberg's proven mental disorders and conditions were significant causes of his misconduct, and therefore "at a minimum, a 'causal connection' does exist between Judge Ginsberg's disability and his misconduct." The Factfinding Panel recommended that "Judge Ginsberg be retired from his judicial duties on the basis that he suffers from a mental disability that seriously interferes with the performance of his judicial duties and is or is likely to become permanent."

On November 5, 2004, the Board filed its findings and recommendations with this court. On November 9, 2004, the Board filed the Factfinding Panel's findings and recommendations with this court. The Board adopted the Factfinding Panel's findings of fact in their entirety. The Board adopted the Factfinding Panel's conclusions, except for the standard of causation and the existence of a causal connection between the disability and misconduct. The Board made three recommendations:

1. The Board recommends that Judge Ginsberg be removed from office based on clear and convincing evidence adduced at the hearing demonstrating that Judge Ginsberg repeatedly violated the Code of Judicial Conduct and engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute in a variety of different contexts over an extended period of time.

2. The Board recommends that Judge Ginsberg be retired from office on the grounds of disability since he currently suffers from a mental condition that is or is likely to become permanent or [sic] that seriously interferes with the performance of his official duties, within the meaning of Minn.Stat. § 490.16, subd. 3.

3. The Board recommends that the Supreme Court find that although there was some causal connection between Judge Ginsberg's mental illness and his actions, it was not sufficient to excuse his misconduct since Judge Ginsberg acted intentionally, with the ability to differentiate between right and wrong and with an understanding of the nature and quality of his actions.

On November 12, 2004, we ordered briefing by the parties and scheduled oral argument for November 30, 2004. On November 17, 2004, pursuant to Rule 13(g), we authorized the Lawyers Board on Professional Responsibility to file a brief and participate in argument on the issue of lawyer discipline for the conduct at issue in this proceeding.

I.

*A. Standards.*

The Minnesota Constitution authorizes the legislature to "provide for the retirement, removal or other discipline of any judge who is disabled, incompetent or guilty of conduct prejudicial to the administration of justice." Minn. Const. art. VI, § 9.[5] The legislature has exercised this

---

man, Ph.D., clinical psychologist, who provides Judge Ginsberg with psychotherapy treatment.

5. Prior to the adoption of the predecessor of this provision in 1972, judges could be removed from office only by impeachment or defeat at the polls. *See In re Kirby,* 350 N.W.2d 344, 346–47 (Minn.1984).

authority in Minn.Stat. § 490.16 (2002). As relevant in this case, the standard established for this court to censure or remove a judge includes "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Minn. Stat. § 490.16, subd. 3 (2002); *see also* Rule 4(a)(5) (incorporating the same standard as ground for judicial discipline). The same statute authorizes us to retire a judge "for disability that seriously interferes with the performance of duties and is or is likely to become permanent." Minn. Stat. § 490.16, subd. 3.

### B. Facts of Misconduct

The facts concerning misconduct by Judge Ginsberg are alleged in Complaints I and III. For the purposes of this proceeding, Judge Ginsberg admitted these facts in his responses to the Board's requests for admissions. The admissions were read into the record at the hearing before the Factfinding Panel. The conduct is described in the findings of the Factfinding Panel, and the Board adopted these findings. The Panel concluded that each of the instances of conduct violated the Rules of the Board on Judicial Standards and the Code of Judicial Conduct. The incidents of misconduct can be described as follows:

#### Complaint I

1. Barricade Case—May 2002. This was a prosecution by the City of Minnetonka of a 67–year–old woman for driving around police barricades. Assistant City Attorney Rolf Sponheim represented the city; the defendant appeared pro se. When the case was called, Judge Ginsberg stated: "Mrs. [S.], you don't look like the type of person who would drive around police barricades." When the defendant asked to plead guilty with an explanation, Judge Ginsberg stated: "Hang on one second here. Yeah, you're on a ramp. You

see the lights, you don't know what to do so you keep going. Reasonable. Did you hurt anybody?" When the defendant explained that no one was hurt and that she had followed another car around the barricades, Judge Ginsberg dismissed the case in its entirety, stating, "this ticket is history." Judge Ginsberg then announced that the defendant was 67 years old and had no driving violations. The gallery applauded. Judge Ginsberg thanked the gallery for showing courtesy to the defendant and gave her $5.00, urging her to buy a cup of coffee before leaving the courthouse. Judge Ginsberg did not ask to hear from the prosecuting attorney before dismissing the case.

2. Disorderly Conduct Case—May 2002. This was a prosecution by the City of Minnetonka for fifth-degree assault and disorderly conduct. Assistant City Attorney Laurel Hersey prosecuted the case; the defendant appeared pro se. The defendant entered a plea of guilty to both charges. After the defendant stated that he had no prior history of assault, Judge Ginsberg accepted the plea for the disorderly conduct charge, but he dismissed the assault charge and sentenced the defendant to a fine of $100 and 5 days in the workhouse, stayed. Judge Ginsberg explicitly stated that the sentence was significantly lighter than he had given on any other assault charge. Judge Ginsberg did not allow the prosecuting attorney to speak before he accepted the plea, dismissed the assault charge, and imposed sentence. When the prosecutor objected to the dismissal of the assault charge, Judge Ginsberg told the prosecutor:

> Well, I've taken a plea to the disorderly conduct and if you want to take that up feel free. But this was a [de minimis] file with a legitimate self-defense claim, with an individual who acted more with a disorderly conduct issue than anything

else. So you've got your remedies, you know what they are. Feel free to take them. Your position is noted. Disorderly conduct it is. Pick her up and start from scratch.

3. Traffic Control Device Case—June 2002. This was a prosecution by the City of Minnetrista for failing to obey a traffic-control device. Assistant City Attorney Laurel Hersey was the prosecuting attorney. The defendant was an attorney, had received a citation, and mentioned the citation while meeting with Judge Ginsberg in chambers while representing a client on an unrelated matter. Judge Ginsberg told the attorney that he had a policy of dismissing such cases. After the meeting with Judge Ginsberg, the attorney asked a deputy clerk to enter the citation into the court's computerized database. Judge Ginsberg then dismissed the citation without giving the city prosecutor an opportunity to be heard.

4. Retaliation for Complaints to Board on Judicial Standards.

August 2002. Desyl Peterson, the City Attorney for the Cities of Minnetonka, Minnetrista, and St. Bonafacius, who supervised the prosecutors involved in the three above-described cases, filed a complaint with the Board on Judicial Standards on July 31, 2002, concerning Judge Ginsberg's handling of those cases. Peterson then requested that the district court not assign any cases being handled by her or her assistants to Judge Ginsberg while the complaint was pending. After learning of the complaint, on August 1, 2002, Judge Ginsberg called Peterson and stated that none of the attorneys had brought their complaints to him and that "for whatever reasons" Hersey had "this idea that she's the victim or she's been picked on." Judge Ginsberg also told Peterson that he was going to collect transcripts and affidavits to show that Hersey had a problem with

another attorney who frequently appeared in the Ridgedale court where he presided. Judge Ginsberg then accused Hersey of trying to get that attorney "booted out" of Ridgedale. He stated that when Hersey's alleged efforts to have the other attorney terminated were "made known, I think all of this will probably be put in a more accurate and reasonable perspective." The other attorney was the wife of the defendant in the Traffic Control Device Case.

February 2003. Cases being handled by Assistant City Attorneys Hersey and Sponheim were assigned to Judge Ginsberg's calendar on February 18, 2003. Hersey filed a notice to remove Judge Ginsberg from her cases. When a court supervisor informed Judge Ginsberg of this, he said he would not leave the bench. Judge Ginsberg then announced to the gallery that those with cases for Minnetonka, Minnetrista, and St. Bonafacius would not be heard that day, stating:

I have some bad news for all of you who are here today for Minnetonka, Minnetrista, and St. Bonafacius cases. Your cases will all be continued as the city attorney seems to be dissatisfied with the way I handle their cases. Now, don't be upset with me, I would be happy to handle your cases, so don't be mad at me, be mad at the Minnetonka City Attorney.

5. Animal Cruelty Case—May 2002. This was a prosecution for animal cruelty, in which the prosecutor and the defendant reached a plea bargain. Defense counsel approached the bench to ask whether Judge Ginsberg would accept the plea agreement, and while reading the complaint, Judge Ginsberg said "let's kill him," apparently referring to the defendant. Judge Ginsberg then had the defendant brought to his chambers with three county sheriff deputies and repeatedly demanded

that the defendant choose one of the deputies with whom to fight. After the defendant chose one of the deputies, Judge Ginsberg said he would set the case for trial before another judge. Judge Ginsberg later wrote a letter to the defendant's attorney and, expressing regret, stated that his comments were not appropriate. Judge Ginsberg then recused himself from further proceedings in the case.

6. Juvenile Assault—June 2003. Two juvenile boys hid Judge Ginsberg's son's bicycle in a dumpster. The Ginsbergs reported the bicycle as stolen. After the bicycle was found, Judge Ginsberg accosted one of the boys, a 14–year–old, at a shopping center. Judge Ginsberg asked the boy why he had taken the bike, but the boy denied any involvement. Judge Ginsberg told the boy never to mess with his family again, grabbed the boy by the shirt, pulled him off his bicycle and pushed him onto a bench. When the boy threatened to call the police, Judge Ginsberg told him "Go ahead, I'm a judge and I'll have you charged with a felony." When the boy said the bicycle's value would not support a felony charge, Judge Ginsberg said "Then, I'll have you charged with a gross [misdemeanor] and you can go to juvey for the night. Would you like that punk?" Judge Ginsberg then slapped the boy in the face with his open hand. When later interviewed by the police about the incident, Judge Ginsberg admitted only tapping the boy's face and denied any other physical contact with him, specifically denying that he had grabbed him and pushed him onto the bench. Judge Ginsberg was charged with two counts of fifth-degree assault and pleaded guilty to one count. At the plea hearing, Judge Ginsberg admitted that he grabbed the boy, took him off his bicycle and put him on a bench and that he slapped his face. The conditions of Judge Ginsberg's sentence included that he remain law-abiding.

*Complaint III*

Property Damage—February 2004. When Judge Ginsberg pulled into a parking space that another shopper intended to use, the other driver made an obscene gesture toward him. Judge Ginsberg then followed the other driver on foot to the space where she parked, jumped onto the hood of her car, claimed she had hit him with her car, and then scratched the side of her car with his car key. As Judge Ginsberg was leaving the store, a security officer who the other driver had summoned told Judge Ginsberg that the police had been called, but Judge Ginsberg refused to remain until the police arrived. When interviewed later by the police, Judge Ginsberg admitted being involved in the incident, but stated that the other driver had struck his leg with her car while he was selecting a shopping cart. A security videotape showed Judge Ginsberg entering the store without a cart. His leg was not injured. Judge Ginsberg was charged with felony criminal damage to property, but after a court trial in November 2004 he was convicted of gross misdemeanor criminal damage to property.

*C. Violations of Rules and Code of Judicial Conduct*

The Factfinding Panel and the Board, by adopting the Panel's findings, found that the foregoing facts had been established by clear and convincing evidence. The Factfinding Panel concluded, and the Board agreed, that Judge Ginsberg's conduct violated the following Rules of the Board that establish grounds for imposition of discipline: Rule 4(a)(5) (conduct prejudicial to the administration of justice that brings the judicial office into disrepute) and Rule 4(a)(6) (conduct that violates the Code of Judicial Conduct). The Factfinding Panel and the Board concluded that the following Canons of the Code

of Judicial Conduct were violated by Judge Ginsberg's conduct: Canon 1 (a judge shall maintain high standards of conduct to preserve the integrity of the judiciary); 2A (a judge shall respect and comply with the law); 2B (a judge shall not allow family, social, political or other interests to influence judicial conduct or judgment); 3A(2) (a judge shall be faithful to the law and maintain professional competence in it); 3A(3) (a judge shall require order and decorum in all proceedings before the judge); 3A(4) (a judge shall be patient, dignified and courteous to litigants, lawyers and others dealt with in an official capacity); 3A(5) (a judge shall perform judicial duties without prejudice); 3A(7) (a judge shall accord every person who has a legal interest in a proceeding or the person's lawyer the right to be heard according to law); and 4A (a judge shall conduct extra-judicial activities so that they do not demean the judicial office). Judge Ginsberg's counsel stated at oral argument that Judge Ginsberg does not contest the conclusions that his conduct violated the Rules and the Code.

Accordingly, we conclude that the Board has satisfied its burden of proving the conduct described above by clear and convincing evidence. Further, we agree that the conduct described above is misconduct prejudicial to the administration of justice that brings the judicial office into disrepute and violates the Canons listed.

### D. Appropriate Discipline

We must next determine what discipline should be assessed for Judge Ginsberg's proven misconduct. The Factfinding Panel recommended retirement based on disability. The Board recommended both retirement based on disability and removal for misconduct, although in its brief and oral argument to this court, the Board appears to be advocating only removal.

 Rule 11 provides that the Board may recommend any of the following sanctions: removal, retirement, discipline as an attorney, limitations or conditions on the performance of judicial duties, censure, a civil penalty, suspension with or without pay, or any combination of the above. Implicitly, in acting on the Board's recommendation we can adopt any of the listed sanctions, individually or in combination. We have the authority to reject or modify the recommendations of the Board. *E.g., In re Miera,* 426 N.W.2d 850, 859 (Minn. 1988); *see also* Rule 13(f).

 In determining the appropriate sanction, we are guided by the principle that the purpose of judicial discipline is not to punish, but "to protect the public by insuring the integrity of the judicial system." *Miera,* 426 N.W.2d at 858. Accordingly,

> [t]he sanction must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future. We act not to punish the wrongdoer but to restore public confidence in the system and its officers.

*Id.*

The Board has recommended that removal is the appropriate discipline for the misconduct committed by Judge Ginsberg. Before 1972, judges could be removed from office only by impeachment or defeat at the polls. See note 5, *supra.* Since 1972 a constitutional amendment and a statute have authorized removal for conduct prejudicial to the administration of justice. We have imposed the sanction of removal only twice. In one of the removal cases, the proven misconduct involved numerous incidents of serious misconduct that the judge committed as an attorney before he was appointed to the bench. *In*

re *Gillard*, 271 N.W.2d 785 (Minn.1978). In the other removal case, the judge had pleaded guilty to two counts of misdemeanor prostitution, and the record established an extensive course of soliciting and engaging in prostitution with young male prostitutes. *In re Winton*, 350 N.W.2d 337 (Minn.1984). In other cases, we have rejected Board recommendations for removal and imposed less severe sanctions. *See Miera*, 426 N.W.2d at 852 (rejecting removal recommendation in favor of public censure and suspension without pay for one year where misconduct consisted of judge's abuse of official position by making unsolicited advances to a close personal assistant and judge's intemperate comments about his judicial colleagues); *In re Kirby*, 354 N.W.2d 410 (Minn.1984) (rejecting removal recommendation in favor of public censure where misconduct consisted of judge's discourteous treatment of female attorneys, public intoxication, conducting judicial business with alcohol on his breath, and habitual tardiness).

▉ In this case we are confronted with essentially two categories of conduct: first, actions taken in or directly related to Judge Ginsberg's role as a judge, and second, two incidents of criminal conduct he committed outside that role. Judge Ginsberg's actions in the Barricade, Disorderly Conduct and Traffic Control Device cases reflect a disregard for due process and the role of the adversarial system in achieving just results because he decided those matters without affording the prosecution an opportunity to be heard. Judge Ginsberg's actions in retaliation against the attorneys who filed complaints with the Board reflect a disrespect for the disciplinary process and a lack of recognition or acknowledgment of possible fault on his part. Finally, Judge Ginsberg's actions in the Animal Cruelty case reflect a serious overreaction to conduct of which he disapproved, a reaction outside the bounds of appropriate judicial conduct. Judge Ginsberg's actions in each of these cases individually were obviously improper and detrimental to the administration of justice; in the aggregate, the effect is compounded.

It is likely that, standing alone, this series of judicial violations would not warrant removal from office. But these actions do not stand alone. We are also confronted with two separate and unrelated instances of criminal conduct by Judge Ginsberg—an assault on a 14–year–old boy and criminal damage to another driver's car. Those who come before the courts cannot reasonably be expected to respect the law if those who preside on the bench are not perceived as respectful of the law. As we stated in *Winton:*

> A judge has a position of power and prestige in a democratic society espousing justice for all persons under law. The role of the judge in the administration of justice requires adherence to the highest standard of personal and official conduct. Of those to whom much is committed, much is demanded. A judge, therefore, has the responsibility of conforming to a higher standard of conduct than is expected of lawyers or other persons in society. Willful violations of law or other misconduct by a judge, whether or not directly related to judicial duties, brings the judicial office into disrepute and thereby prejudices the administration of justice. A judge's conduct in his or her personal life adversely affects the administration of justice when it diminishes public respect for the judiciary. Our legal system can function only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions. The essential attributes of a judge are not only intellectual compe-

tence but adherence to ethical standards of conduct.

350 N.W.2d at 340.

Criminal conduct affects not only the public's perception of Judge Ginsberg, but also undermines the public's confidence and respect for the judiciary as a whole. That Judge Ginsberg must serve the criminal sentences imposed for his crimes is not sufficient to ensure the public's confidence in the judicial branch. Nor can these incidents be fairly characterized as isolated, momentary losses of temper or lapses of judgment in the heat of the moment. The record demonstrates that after each incident, Judge Ginsberg lied to the police about what had happened, suggesting a motive to protect himself from bearing responsibility for his actions and a further disregard for the proper functioning of the law enforcement system. Moreover, both of these instances occurred when Judge Ginsberg knew he was already under scrutiny by the Board for the first set of judicial misconduct, which should have made him even more circumspect in his behavior. We conclude that any sanction short of removal would be wholly inadequate in the face of this aggregation of serious misconduct.

### E. Effect of Disability on Discipline.

There is more to this case, however, than finding that misconduct occurred and assessing the appropriate discipline. The experts all agree, and the Board has concluded, that Judge Ginsberg suffers from mental illness that prevents him from performing his duties as a judge. The question is whether this disability should affect the imposition of the disciplinary sanction of removal from office.

The Board argues strenuously that mental illness should not excuse misconduct by a judge. Further, the Board argues that if mental illness can be considered as a miti-gating factor in determining the appropriate discipline, a judge must be held to at least the standard required for lawyers to establish mitigation in lawyer discipline cases. Specifically, the Board argues that a judge who claims disability mitigation should be required to prove by clear and convincing evidence each of the elements required of lawyers in *In re Weyhrich*, 339 N.W.2d 274 (Minn.1983). In *Weyhrich*, we held that when a lawyer raises psychological disability as a mitigating factor in a lawyer discipline case, he must prove:

> [1] that he indeed has a severe psychological problem, [2] that the psychological problem was the cause of the misconduct, [3] that he is undergoing treatment and making progress to recover from the psychological problem which caused or contributed to the misconduct, [4] that the recovery has arrested the misconduct, and [5] that the misconduct is not apt to recur.

*Id.* at 279.

It is not clear to us, however, that Judge Ginsberg is requesting that his disability be used to mitigate the discipline imposed for his misconduct. In the lawyer discipline cases relied on by the Board, the lawyers subject to discipline argued that the discipline imposed should be reduced because their misconduct was caused by psychological disorders. In his submission to our court, Judge Ginsberg argues that removal from the bench is an unnecessary disciplinary sanction, not because his mental illness mitigates his misconduct, but because he has already been suspended from his position as a judge and he did not file for reelection, which means that his term expires at the end of this year. He asserts that he is, in essence, "already gone." Therefore, as we understand it, Judge Ginsberg's primary argument concerning disability is not that his disability

bars disciplinary removal, but that it entitles him to disability retirement.

■ We cannot agree with Judge Ginsberg's argument that disciplinary action is obviated by the fact that he is "already gone." As we have explained, the primary purpose of judicial discipline is not to punish the judge, but rather to send a message to the judge, to other judges, and to the public that the conduct at issue violated the standards to which we will hold judges and that such conduct will not be condoned. This purpose can and should be served by the imposition of appropriate discipline, even though absent any discipline Judge Ginsberg will be leaving office. *See In re Yaccarino*, 101 N.J. 342, 502 A.2d 3, 30 (1985) (deciding that pendency of application for disability retirement did not obviate disciplinary proceedings).

■■ The Board urges us to articulate standards that should be used to determine whether mental illness or similar disability should mitigate the discipline otherwise appropriate for guidance in future cases. We agree that mitigation standards applicable to judges cannot be less stringent than those applied to lawyers, and accordingly adopt the requirements identified in *Weyhrich* as applicable in judicial discipline cases as well as lawyer discipline cases. Those factors are (1) proof of a serious mental illness that (2) caused the misconduct, coupled with (3) proof of treatment that (4) has abated the cause of the misconduct such that (5) the misconduct is not apt to recur. These requirements are particularly appropriate where a judge seeks mitigation of discipline that would allow him to remain on the bench. We also agree that, as in lawyer discipline cases, when a judge asserts mental illness or other disability as an affirmative defense to mitigate the discipline, the judge should bear the burden of proof to establish the *Weyhrich* requirements by clear and convincing evidence.

Because we do not understand Judge Ginsberg to argue that his mental illness should mitigate the discipline imposed for his misconduct, we need not apply the *Weyhrich* test in this case. Accordingly, notwithstanding the evidence of Judge Ginsberg's mental illness, we adhere to our conclusion that the Board established significant misconduct that warrants Judge Ginsberg's removal from office.

II.

The next issue we must decide is whether Judge Ginsberg should be retired based on his disability. Although he argues that our only action should be to impose retirement, Judge Ginsberg also asserts that we can both remove him for discipline and retire him based on disability. In other words, he argues that removal from office does not make him ineligible for disability retirement.

In addressing this issue, we must recognize that there are two aspects to the disability retirement issue. The first is that disability retirement is one of the sanctions available in a judicial discipline case under both the statute and the Board Rules, which enable us to remove a judge involuntarily from office based on disability. The second aspect relates to the statutory provisions for judicial disability retirement benefits.

■ In discussing either aspect, we must acknowledge the unanimous and undisputed evidence that Judge Ginsberg suffers from three diagnosed, significant mental illnesses that all of the mental health experts agree prevent him from functioning as a judge currently and for the foreseeable future. Accordingly, we conclude that Judge Ginsberg satisfies the standard articulated in Minn.Stat. § 490.16, subd. 3, which authorizes us to

retire a judge for a disability that seriously interferes with the performance of his judicial duties and is or is likely to become permanent.

■ Based on section 490.16, subd. 3, and the Rules of the Board, it is clear that we can involuntarily retire a judge based on disability and that the standard clearly has been met here. The question we must answer is whether and how our conclusion that Judge Ginsberg should be removed for misconduct affects our authority to retire him based on disability. Judge Ginsberg argues that removal for misconduct and retirement on disability are not mutually exclusive alternatives. We agree. The language of Board Rule 11(d)(8) expressly permits a combination of the listed sanctions, and the list includes both removal and retirement.

We must also consider the statutory aspects of disability retirement for judges. We have noted earlier that Minn.Stat. § 490.16, subd. 3, authorizes us to retire a judge for disability that seriously interferes with the performance of duties and is or is likely to become permanent. Minnesota Statutes § 490.101, subd. 2 (2002), provides that a judge who becomes physically or mentally incapacitated from performing official duties is entitled to receive a disability benefit, if either the governor has determined that the judge shall be retired or the judge "is retired by the supreme court under section 490.16, subdivision 3." Minnesota Statutes § 490.16, subd. 4 (2002), provides that "[a] judge retired by the supreme court shall be con-

sidered to have retired voluntarily." Additionally, Minn.Stat. § 490.16, subd. 6 (2002), authorizes receipt of retirement benefits regardless of removal. That statute provides:

> This section and section 490.15, shall not affect the right of a judge who is suspended, retired, or removed hereunder from qualifying for any pension or other retirement benefits to which the judge would otherwise be entitled by law.

*Id.* Because subdivision 6 references a judge who is retired under section 490.16, the benefits preserved by subdivision 6 must include disability retirement benefits.

These statutes evince a clear legislative intent that neither removal for misconduct nor involuntary retirement will operate as a bar to a judge's receipt of disability retirement benefits to which he is otherwise entitled.[6] Furthermore, both the Rules of the Board and the statutes governing disability retirement for judges contain provisions that allow a judge removed from office to receive disability retirement, clearly indicating that removal and disability retirement are not mutually exclusive alternatives. Thus, we conclude that we have the authority to retire Judge Ginsberg based on disability in conjunction with his removal for misconduct.

■ In this case, such a retirement would not be involuntary because Judge Ginsberg now seeks disability retirement from this court, just as he applied for disability retirement from the governor in September 2003. Other courts have con-

---

**6.** This preservation of the right to receive disability retirement benefits is consistent with the contractual nature of judicial retirement benefits generally that we recognized in *Sylvestre v. State*, 298 Minn. 142, 155, 214 N.W.2d 658, 666 (Minn.1973) (explaining "retirement compensation constitutes deferred payment of part of the judge's salary, if he is willing to retire, which cannot be diminished

during his continuance in office; and upon his retirement the contract is fully performed. He is then entitled to be paid what the state promised him when he took office * * *."). *Cf.* Minn.Stat. § 352.113, subds. 1–4 (2002) (providing that executive branch employees are entitled to statutory disability benefits under specific conditions even after removal for cause).

cluded that disciplinary and disability retirement proceedings should be kept separate. *See In re Yaccarino*, 101 N.J. 342, 502 A.2d 3, 31 (1985) ("We conclude that respondent's application for a retirement based on medical disability cannot supplant in these judicial-removal proceedings. We are further satisfied that these removal proceedings do not, and should not, constitute a bar to respondent's pending application for a retirement pension based upon disability which should now proceed."). Although separating the discipline and disability retirement proceedings could be an option here, as discussed above we read the governing statutes and rules to permit both removal and retirement by this court. Having concluded based on overwhelming and uncontradicted evidence that Judge Ginsberg meets the statutory standard for disability retirement, we conclude further that he is entitled to receive the disability retirement benefits provided by statute. To ensure his eligibility for those benefits, we will retire Judge Ginsberg based on disability in conjunction with his removal for misconduct.

 The remaining issues with respect to disability retirement relate to process and timing. Minnesota Statutes § 490.121, subd. 14 (2002), defines a judge's disability retirement date as "the last day of the first month after which the governor determines, upon voluntary application by the judge or otherwise, that a judge suffers from a disability." This statute perhaps suggests that even after we have retired a judge based on findings of disability, the governor must also act to create a disability retirement date that is the trigger for receipt of benefits.[7] *See also* Minn.Stat. § 490.126, subd. 2 ("Any

judge may make written application to the governor for retirement."). But another statute suggests that eligibility for disability benefits is triggered by disability retirement imposed by this court as an alternative to gubernatorial action. *See* Minn. Stat. § 490.101, subd. 2 (providing that an incapacitated judge shall be entitled to a disability benefit if "the governor has determined that the judge shall be retired * * * or *if a judge is retired by the supreme court because of a disability pursuant to section 490.16, subdivision 3*.") (emphasis added). We conclude that an order of this court determining that a judge satisfies the statutory standard for disability retirement and shall be retired is sufficient to establish the disability retirement date, just as a disability determination by the governor establishes a disability retirement date.

 We must also note that since June 2003 Judge Ginsberg has been receiving full salary and benefits while not serving on the bench, first on medical leave of absence and since June 2004 on suspension under our order based on the felony charge filed against him. Judge Ginsberg applied for disability retirement to the governor in September 2003, but the governor has taken no action on that application. Finally, based on the determination that Judge Ginsberg's mental illness rendered him unable to assist in his defense, the Board recommended in February 2004 that Judge Ginsberg be retired based on disability. Had Judge Ginsberg been retired based on his application to the governor or based on the Board's recommendation earlier this year, either of which circumstance might have occurred

7. Minnesota Statutes § 490.124, subd. 4 (2002), provides that a disabled judge is entitled to continuation of his full salary, payable by the judge's employer, for a period of up to one full year after the judge's disability retirement date. The entitlement to full salary is for "up to" one year because the continuation of full salary ceases if the judge reaches mandatory retirement age before the year has elapsed.

but for the intervention of the additional criminal conduct, his final year of full salary to be received after his early retirement date would have been running at least since June 15, 2004, the date when he was suspended by this court. Providing an additional year of full salary under the circumstances of this case is neither appropriate nor equitable. Accordingly, the disability retirement of Judge Ginsberg shall be deemed retroactive to June 15, 2004, the date we suspended Judge Ginsberg with pay based on the felony charge. Judge Ginsberg's year of full salary authorized by Minn.Stat. § 490.124, subd. 4, shall run from that date.

### III.

The final issue we must decide is whether Judge Ginsberg should also be sanctioned in his capacity as an attorney duly licensed to practice law in the State of Minnesota. The Rules of the Board on Judicial Standards recognize that the court may address the issue of lawyer discipline in the context of a judicial discipline proceeding. Specifically, Rule 13(g) provides that when the Board on Judicial Standards recommends the removal of a judge, we shall notify the Lawyers Professional Responsibility Board and give them an opportunity to be heard on the issue of lawyer discipline. The Lawyers Board was notified in this case and given an opportunity to file a brief and present oral argument. In addition, Rule 16(d) provides that a judge who is involuntarily retired "may, upon order of the Supreme Court, be transferred to inactive status or indefinitely suspended from the practice of law in the jurisdiction."

The Director of the Office of Lawyers Professional Responsibility has made two alternative recommendations in this case. The Director points out that in the past 20 years the only lawyer discipline imposed based on judicial misconduct occurred in *In re Miera,* 426 N.W.2d 850 (Minn.1988). In that case, Judge Miera was suspended from judicial office for one year and publicly reprimanded as a lawyer. *Id.* at 859. The Director argues that the misconduct at issue in this case goes far beyond the misconduct in the *Miera* case because, here, there were multiple instances of misconduct, some of which involved court proceedings and two of which involved criminal conduct. The Director concludes that the appropriate lawyer discipline for the misconduct admitted by Judge Ginsberg is suspension for a minimum of 90 days, with reinstatement contingent on demonstrating fitness to practice law in a Rule 18, Rules on Lawyers Professional Responsibility (RLPR), reinstatement proceeding.

The Director argues further that he cannot determine whether there are mitigating factors that should reduce the appropriate lawyer discipline because the extent of the causal connection between the misconduct and Judge Ginsberg's mental condition is not clear. The Director recommends, alternatively, that if we determine that the misconduct was caused by psychological disorders, then, in order to protect the public, Judge Ginsberg should be publicly reprimanded and immediately transferred to disability inactive status as a lawyer. Rule 28(a), RLPR, provides the standard for lawyer disability inactive status: "A lawyer whose physical condition, mental illness, [or] mental deficiency, * * * prevents the lawyer from competently representing clients shall be transferred to disability inactive status." The Director contends that this standard and the standard for disability retirement of a judge are functionally equivalent.

Judge Ginsberg responded to the Director's brief, in the very limited time available. In his response, he consents to a transfer to disability inactive status.

With regard to causation, he argues that the Factfinding Panel found that his mental condition was a substantial cause of his misconduct.

Consideration of the issue of lawyer discipline in the context of a judicial discipline proceeding is appropriate both for purposes of judicial economy and to avoid the imposition of additional stress and costs of a separate lawyer discipline proceeding on the respondent judge/lawyer. Nevertheless, the lawyer discipline issue must receive independent consideration because, as we have stated above, the standard of conduct imposed on an individual as a judge is higher than the standard imposed on lawyers. Therefore, a determination that certain misconduct warrants removal from office as a judge does not necessarily mean that the individual should be barred from the practice of law.

Furthermore, where there is an issue of disability raised in the judicial discipline proceeding, the disability issue must also be addressed in the context of the individual's license to practice law. But we disagree with the Director's argument that the two standards of disability are functionally equivalent. The standard for judicial disability is a disability that "seriously interferes with the performance of [judicial] duties," Minn.Stat. § 490.16, subd. 3, and the standard for lawyer disability is disability that "prevents the lawyer from competently representing clients." Rule 28(a), RLPR. The fact that a judge may be permanently disabled from performing the functions of that office does not necessarily mean that the individual is disabled from competently representing clients as a lawyer. It is possible that an individual who for psychological reasons cannot handle the demands of judicial office could find an appropriate setting in which the lawyer could competently practice law.

With these considerations in mind, we first must determine the appropriate lawyer discipline for the misconduct proven in this case. As is the case with judicial discipline, lawyer discipline is not intended to punish. Rather, the purpose of lawyer discipline is "to guard the administration of justice and to protect the courts, the legal profession, and the public." *In re Bergstrom*, 562 N.W.2d 674, 676 (Minn.1997) (quoting *In re Simonson*, 420 N.W.2d 903, 906 (Minn.1988)). In determining appropriate discipline, we consider the nature of the misconduct, the cumulative weight of the disciplinary violations, the harm to the public, and the harm to the legal profession, as well as any mitigating or aggravating circumstances. *Id.* We look to cases involving similar misconduct to assess the appropriate discipline. *E.g., In re Gherity*, 673 N.W.2d 474, 481 (Minn.2004).

We agree with the Director that the misconduct at issue here is significantly more serious than the conduct at issue in the *Miera* case. Here we are faced with two separate criminal misdemeanor convictions, each of which involved Judge Ginsberg's lying to the police in the investigation of the incidents. In addition, before us are the incidents involving Judge Ginsberg's behavior on the bench that evidenced a disregard for the rights of litigants and their counsel, as well as a retaliation issue involving an inappropriate response to the filing of disciplinary complaints.

Criminal conduct encountered in lawyer discipline cases most often has been at the felony level and frequently has resulted in disbarment. *See, e.g., In re Perez*, 688 N.W.2d 562 (Minn.2004); *In re Samborski*, 644 N.W.2d 402 (Minn.2002); *In re Kraemer*, 361 N.W.2d 402 (Minn.1985). But, in a few cases, particularly where the

criminal conduct was not directly related to the practice of law, we have stopped short of disbarring a lawyer convicted of a felony. *See, e.g., In re Hanson,* 592 N.W.2d 130 (Minn.1999); *In re Clapp,* 536 N.W.2d 895 (Minn.1995). Misdemeanor convictions have resulted in discipline ranging from public censure to indefinite suspension for a minimum of five years, the latter discipline having been imposed on a lawyer convicted of fifth-degree assault and disorderly conduct. *In re Finley,* 261 N.W.2d 841 (Minn.1978) (public censure); *Gherity,* 673 N.W.2d at 476 (indefinite suspension). Based on a comparison with these cases, we conclude that the Director's recommendation of suspension for 90 days is too lenient, and a suspension for a period of one year is more consonant with the level of misconduct at issue in this case.

■■ We also must address the issue of mitigation in the context of lawyer discipline. As discussed above, when a lawyer asserts that a psychological condition should mitigate the discipline imposed on his license to practice law, he must prove by clear and convincing evidence the requirements set forth in *Weyhrich.* See p. 550, *supra.* The expert evidence here is unequivocal that Judge Ginsberg has not satisfied at least the last two *Weyhrich* requirements because he has not proven that treatment has abated the psychological conditions asserted as the cause of his misconduct or that the misconduct is not likely to recur.

Although Judge Ginsberg has not proven the elements necessary for his mental illness to mitigate lawyer discipline, in view of the fact that we have concluded that he is disabled from performing his judicial duties, we must address whether he is competent to practice law. Based on clear and convincing expert testimony of his mental disability, we conclude that

Judge Ginsberg is also currently disabled from competently representing clients. Accordingly, a combination of a disciplinary suspension and disability inactive status is appropriate with respect to Judge Ginsberg's license to practice law. We order Judge Ginsberg's license to practice law suspended for a period of one year from the date of this opinion and following the suspension, that he be placed on disability inactive status.

At the expiration of the one-year suspension, Judge Ginsberg may petition for reinstatement to the practice of law through a reinstatement hearing under Rule 18, RLPR. As part of any reinstatement proceeding, Judge Ginsberg will be required to undergo an independent psychological examination by a licensed mental health professional selected by the Director and will be required to prove that he is psychologically fit to practice law. If reinstated to the practice of law, Judge Ginsberg shall be subject to whatever conditions are required to ensure protection of the public, based on expert testimony presented at the reinstatement hearing, including, if warranted, continuation of therapy for his mental conditions, with periodic reports to the Director from his treating professional(s) concerning his continued fitness to practice law.

## IV.

Based on the foregoing, it is the order and judgment of this court that respondent Harvey C. Ginsberg, be, and hereby is:

(1) removed from his office as district court judge;

(2) retired from office as district court judge based on disability effective June 15, 2004;

(3) suspended from the practice of law for a period of one year;

(4) transferred to disability inactive status as an attorney effective upon the expiration of the one-year suspension;

(5) eligible for reinstatement to the practice of law only through a reinstatement hearing in accordance with Rule 18, RLPR, and subject to the conditions stated in this opinion.

BLATZ, C.J., took no part in the consideration or decision of this matter.