737 N.W.2d 355 (2007)
Inquiry into the Conduct of the Honorable Thomas M. MURPHY (retired).
No. A06-0306.
Supreme Court of Minnesota.
August 23, 2007.
*357 Edward F. Kautzer, Ruvelson & Kautzer Chartered, St. Paul, MN, for Thomas M. Murphy.
Douglas A. Kelley, Steven E. Wolter, Kelley & Wolter, P.A., Minneapolis, MN, for Board on Judicial Standards.
Heard, considered, and decided by the court en banc.

OPINION
PER CURIAM.
The Honorable Thomas M. Murphy, retired Judge of District Court, challenges the recommendation of the Minnesota Board on Judicial Standards that he receive a public reprimand for attempting to influence the testimony of a witness in the Board's investigation into his conduct and for his ex parte handling of a traffic ticket belonging to the son of an administrative clerk employed by the judicial district. We publicly reprimand Judge Murphy for *358 his behavior toward the witness and for his handling of the ticket.
On April 13, 2005, the son of one of the senior clerks in the Dakota County Court Administrator's Office received a petty misdemeanor citation for speeding in violation of Minn.Stat. § 169.14 (2006).[1] The location where the son was stopped falls within the unincorporated area of Dakota County and prosecution of the ticket fell within the jurisdiction of the Dakota County Attorney's Office. The son was ordered to appear on May 25 at the Hastings courthouse.
Judge Murphy was appointed as a district judge chambered in Dakota County in 1985. He was re-elected to successive judicial terms until he retired in 2004. Since then, he has served as a judge of district court pursuant to appointment under Minn.Stat. § 2.724, subd. 3 (2006) with chambers in the West St. Paul courthouse. The clerk, ticket in hand, approached Judge Murphy in his chambers on April 18. Judge Murphy was catching up on work and reviewing mail, and no one else was present. The clerk later testified that she told Judge Murphy, "[t]his is my son's ticket. * * * [I]instead of him taking the day off work and missing the pay, and instead of him pleading guilty to it and paying it and it going on his driving record, is there something that you could do?" Judge Murphy testified that the clerk came in and said, "[d]o we want to take care of this, or [c]an we get this resolved, or something of that extent." He testified that the clerk did not say, and he did not know, that the cited driver was her son.
Judge Murphy looked over the ticket and the son's driving record, noting that the driver had no moving violations for seven years. Judge Murphy continued the citation for dismissal[2] for six months and assessed $50 in court costs. He later testified that this was a standard disposition for this type of ticket, and that the handling of a traffic ticket in chambers without a prosecutor was common in Dakota County. He gave the ticket back to the clerk for processing. No Dakota County prosecutor had an opportunity to provide input into the disposition of the ticket.
The incident cost the clerk her job. A written policy prohibits Dakota County court personnel from seeking special treatment from judges on behalf of themselves, their family, or their friends. The policy applies only to court personnel, not to judges. In response to an anonymous complaint,[3] the district court administrator investigated and told the clerk to resign or she would be fired. She resigned.
After the Board on Judicial Standards learned of the incident, it solicited comment from Judge Murphy in a letter dated September 27, 2005. Judge Murphy answered by letter, explaining that because the clerk and her son have different last *359 names and the clerk did not disclose their relationship, he did not know the driver was the clerk's son. He also noted that he gave the ticket a standard disposition. Judge Murphy added that the clerk was "somewhat evasive" during the conversation and that he believed his mistake was "not inquiring further into this matter." He also added, "[h]ad I known it was her son, I know I would not have gone ahead with the matter." The board sent Judge Murphy a proposed public reprimand on November 28, 2005.
After receiving this proposed reprimand, Judge Murphy left the clerk a phone message at home, asking her to call him. She called back the next day. After exchanging small talk, Judge Murphy told the clerk that she never told him the cited driver was her son. The clerk insisted that she had told him. She testified that she was upset after the phone call because she felt that Judge Murphy was asking her to change her story. The clerk also recalls Judge Murphy telling her they needed to "get [their] stories straight" for the board. Judge Murphy "unequivocally" denies making that statement. According to Judge Murphy, the call ended with the understanding that "[y]ou tell your side, I'll tell my side and away we go."
On January 19, 2006, the board issued a formal statement of complaint against Judge Murphy for affording the clerk special treatment. On March 6, Judge Murphy left a message for the clerk at home, telling her that he hoped they were still "buddies" and that he had "no axe to grind" with her.[4] He also stated that "everybody" was telling the board that the disposition of the ticket would have been the same no matter where it was handled. He made the call because the courthouse "rumor mill" informed him that the clerk thought he was "terribly mad with her and angry at her."
Pursuant to Rule 10, Rules of Board on Judicial Standards, we appointed a fact finding panel consisting of Hon. Andrew W. Danielson, Hon. Spencer J. Sokolowski, and Ann M. Bailly. A public hearing was held before the panel on April 26 and 27, 2006. Judge Murphy was present throughout the hearing. On June 24, the panel submitted its proposed findings and recommendations to the board.
The panel recommended that the complaint be dismissed in its entirety and that Judge Murphy be awarded costs. The panel found that the board failed to prove that Judge Murphy afforded any special treatment to the clerk, suggested anything improper to the clerk regarding her testimony before the panel, or violated any of the Canons of Judicial Conduct as alleged in the board's complaint. The panel found that the clerk announced that the ticket belonged to her son, but Judge Murphy was busy reviewing mail and files and did not hear her. The panel also found that "a standard-type disposition has developed in Dakota County where a traffic offender with a clean record for one (1) year would receive either a stay of adjudication or a *360 continuance for dismissal and have costs assessed. This was the type of disposition provided to [the clerk's son]," and therefore "[c]learly, no special treatment was rendered whether Judge Murphy knew or did not know about the relationship between [the clerk] and [the driver]." The panel further found that non-mandatory court appearance traffic citations are routinely handled by judges without the input of a prosecutor.
The board, nevertheless, recommended that Judge Murphy be publicly reprimanded and removed from the roster of retired judges eligible for assignments. It has since withdrawn the recommendation of removal. The board asserts that the phone conversation and the voicemail from Murphy to the clerk were inappropriate attempts to influence her testimony before the panel and that his in-chambers handling of the ticket was improper. The board asserts that Judge Murphy's behavior violated Rules 4(a)(5) and 4(a)(6), Rules of Board on Judicial Standards (making "[c]onduct prejudicial to the administration of justice that brings the judicial office into disrepute" and "[c]onduct that constitutes a violation of the Code of Judicial Conduct or Professional Responsibility" grounds for discipline). With respect to Rule 4(a)(6), the board asserts that Judge Murphy's conduct violated Canons 1, 2A, 2B, and 3A(7), Code of Judicial Conduct.[5] We will first consider Judge Murphy's contact with the clerk after the investigation began, and then consider his handling of the ticket.

I.
When this court imposes judicial sanctions, the purpose of the discipline is not to punish but to protect the public by insuring the integrity of the judicial system. In re Miera, 426 N.W.2d 850, 858 (Minn.1988). "The sanction must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future. We act not to punish the wrongdoer but to restore public confidence in the system and its officers." Id.
*361 The board must prove by clear and convincing evidence that Judge Murphy engaged in misconduct. Id. at 853. The fact finding panel's function is to develop the most complete record possible for consideration by the board and this court. Id. at 855. "The board may substitute its judgment for that of the fact-finder." Rule 11(c), Rules of Board on Judicial Standards. This court then independently reviews the record and the proceedings and may accept, reject or modify in whole or in part the recommendation of the board. Rule 13(f), Rules of Board on Judicial Standards; see In re Miera, 426 N.W.2d at 855 (noting that this court "makes an independent review of the record" and may consider evidence not admitted by the panel); In re Snyder, 336 N.W.2d 533, 536 (Minn.1983) (exercising our "authority to independently review the record of the proceedings before the Board on the law and on the facts" and reaching factual conclusions); In re McDonough, 296 N.W.2d 648, 691 (Minn. 1979) (describing the "particularly zealous study by every member of this court of the record before us, conducted with a heightened awareness of our independent role"). We are sensitive, however, to the fact that the panel had the opportunity to view the witnesses as they testified and is therefore in a superior position to assess credibility. In re Miera, 426 N.W.2d at 854. The board argues that even if Judge Murphy did not say, as the clerk testified, that he and the clerk ought to "get [their] stories straight," the mere act of contacting her after the board's investigation began was improper because it may have been an attempt to ingratiate himself with the clerk and because it created the appearance of impropriety. The board directs our attention to In re Empson, 252 Neb. 433, 562 N.W.2d 817 (1997). In Empson, the Nebraska Supreme Court considered a complaint that addressed, among other things, a judge's continuing pattern of offensive conduct, including sexual harassment of female court personnel. Id. at 822. The judge contacted two of the alleged victims before they testified in the matter, yelling at one and paying the other compliments on her legal abilities. Id. at 831-32. While the court found that the judge did not attempt to get the victims to change their testimony, it was "troubled by respondent's contacting individuals about a future proceeding of which he is the subject, especially when respondent was aware that those persons were going to testify against him at the proceeding." Id. at 832. The fact that one of the witnesses felt threatened by the contact and the other thought the judge was trying to ingratiate himself with her added to the court's discomfort. Id. The court found that the judge's actions in contacting the witnesses "br[ought] into question respondent's judgment and judicial temperament, and create[d] an appearance of impropriety" in violation of the Nebraska Code of Judicial Conduct. Id.
While Judge Murphy's conduct was not as egregious as that in Empson, it created a similar appearance of impropriety. Judge Murphy's statements that he and the clerk were "buddies" and that he had "no axe to grind" with her look like rather transparent attempts to ingratiate himself with her. Judge Murphy's statement that the board was "hearing from everybody" that the disposition of the ticket was standard appears to be an attempt to foreclose the clerk from testifying otherwise.
Judge Murphy denies that he had improper contact with the clerk and states that he "[doesn't] see the harm in talking to somebody that you know." We note that, although Judge Murphy and the clerk apparently had a professional relationship *362 and would sometimes smoke together outside the building, the record contains no evidence that Murphy and the clerk previously communicated outside of work hours or outside of the workplace. On this record, Judge Murphy's assertion that he was merely carrying on his friendship with the clerk is dubious. More disturbingly, even if the phone calls were within the parameters of their friendship, Judge Murphy initiated the calls partially, if not exclusively, for the purpose of discussing a pending investigation into his own conduct, knowing that the clerk would be a witness in that investigation. He also went so far as to openly contradict her version of events.
Even assuming that Judge Murphy acted in good faith, his contacts with the clerk reflect an alarming lack of judgment. A judge's contact with a witness in an ongoing disciplinary investigation into his conduct, outside of work hours, outside of the work setting, for the purpose of discussing the investigation, does not promote public confidence in the integrity and impartiality of the judiciary. Judge Murphy's conduct, therefore, was a violation of Canon 2A, Code of Judicial Conduct,[6] and Rule 4(a)(6), Rules of Board on Judicial Standards.
We must next decide what discipline to impose for this violation. The board is charged with recommending any of several sanctions. See Rule 11, Rules of Board on Judicial Standards. This court can then adopt, reject, or modify the board's recommendation. In re Ginsberg, 690 N.W.2d 539, 548 (Minn.2004). The board recommends that Judge Murphy receive a public reprimand, and we adopt this recommendation.

II.
The board argues that Judge Murphy's treatment of the ticket violated the canons of judicial ethics because it did not occur in a proceeding open to the public, because no prosecutor had input, and because it created the appearance that the judicial system favors those who have connections to judges. The board also suggests that Judge Murphy knew that the ticket belonged to the law clerk's son. Judge Murphy argues that he gave the son's ticket a standard disposition and that traffic tickets are routinely handled in a similar manner in Dakota County. He also notes that Rule 4(c), Rules of Board on Judicial Standards, prohibits imposition of discipline upon a judge who applies the law as he understands it without fraud, corrupt motive, or bad faith.
A. The disposition of the ticket
To assess the propriety of Judge Murphy's handling of the ticket, we must place it against the backdrop of standard practice in Dakota County. The panel heard testimony as to how petty misdemeanor traffic tickets are handled in Dakota County from four witnesses: Judge Richard Spicer, Christopher Groves, Lori Hunstad, and Scott Hersey.
*363 Judge Spicer, who was the Chief Judge of the First Judicial District from 2001 through 2005, testified that he routinely handles petty misdemeanor traffic tickets similar to the ticket at issue here without prosecutorial input. He testified that on many occasions clerks have come to his chambers with petty misdemeanor traffic tickets from individuals who came to the wrong courthouse, appeared on the wrong day, or lived out of town and mailed the ticket in. Judge Spicer testified that "a day [didn't go] by" where he didn't see a clerk about a petty misdemeanor and that he felt free to resolve these matters without talking to a prosecutor. He went on to testify that he "resolved 40 cases yesterday morning alone without any input from prosecutors, and at their request" and that in Apple Valley he might handle 100 petty misdemeanors in a morning, 90 of them without prosecutorial input. Judge Spicer explained that Dakota County prosecutors want judges to handle petty matters without individual input because the sheer volume of cases requires it. He also testified that the disposition of the ticket at issue was not unusual.
Christopher Grove is an attorney in private practice who formerly prosecuted misdemeanors for the City of Apple Valley and who had also defended misdemeanors in Dakota County. He testified that the courts in Apple Valley, Hastings, and West St. Paul might each handle more than 100 petty misdemeanors and misdemeanors in a morning. He testified that judges in Dakota County routinely resolved petty misdemeanors without input from prosecutors, and that he appreciated their doing so because it would be "impossible" to be involved or provide input into each petty misdemeanor case. He further testified that he would resolve cases where the defendant was not personally present, for instance where a parent would come in on behalf of a child, or a spouse on behalf of a spouse. He also testified that a stay of adjudication for six months with $50 in court costs was "consistent with what would normally happen" to a ticket for traveling fourteen miles per hour over the speed limit where the defendant had a "clean" record.
Lori Hunstad has been an Office Services Supervisor at the Dakota County District Court in Hastings for twenty-five years. She testified that tickets are sometimes handled in chambers without a prosecutor present, that judges sometimes resolve tickets for parties who show up on the wrong date or at the wrong location, and that the disposition of the ticket was not unusual.
Scott Hersey is head of the Criminal Division at the Dakota County Attorney's Office. He testified that it was his policy to handle most matters in open court and that he would have objected to ex parte contact between a defense attorney or defendant and a judge in chambers. He conceded, however, that such contacts happen, and did not testify that he had ever complained about this practice.[7] He testified that he prefers to resolve petty misdemeanors with a guilty plea not accepted, rather than a continuance for dismissal, to avoid possible problems of proving the violation later, and that he would not have offered a continuance for dismissal here in light of the driver's history of license suspensions and revocations. He testified, however, that prosecutors exercise discretion and may offer a continuance for dismissal based on their review of a case, and *364 further that any judge could have given the ticket a continuance for dismissal.
From this testimony, we conclude that ex parte disposition of traffic tickets without prosecutorial input is common in Dakota County; that it is not unusual for clerks to present traffic tickets to judges in chambers; that a continuance for dismissal with court costs is not an unusual disposition for a ticket issued to a defendant with a "clean" record for driving 79 m.p.h. in a 65 m.p.h. zone;[8] and that tickets are sometimes resolved for a party who is not even present in the courthouse. On this record, therefore, we conclude that the disposition of the ticket was within the range of normal dispositions for similar traffic violations in Dakota County. We also conclude that ex parte resolution of similar traffic violations without prosecutorial input is common in Dakota County.[9]
Thus, we cannot conclude that the board has proven by clear and convincing evidence that Judge Murphy's resolution of the ticket violated Canon 2B, either because it was done in chambers rather than in open court or because it was continued for dismissal. Canon 2B bars a judge from allowing "family, social, political or other relationships to influence judicial conduct or judgment." Given the undisputed testimony of the witnesses before the fact finding panel that judges in Dakota County resolve similar petty misdemeanor citations in chambers rather than in open court, we conclude the board failed to prove by clear and convincing evidence that Judge Murphy's handling of this ticket in chambers was influenced by a "family, social, political or other relationship [ ]" between the clerk and Judge Murphy.
The Board relies on Ginsberg to argue that Judge Murphy violated Canon 3A(7), which requires him to afford all interested parties an opportunity to be heard. In Ginsberg we found, in relevant part, that a judge acted improperly by denying a prosecutor an opportunity to be heard on three occasions. 690 N.W.2d at 549. On the first two occasions, Judge Ginsberg dismissed charges at a hearing in open court without allowing the prosecutor, who was present, to be heard. Id. at 545. Here, in contrast, Judge Murphy continued the ticket for dismissal, rather than dismissed it outright, and he presented testimony that prosecutors in Dakota County did not want to be heard with regard to every petty misdemeanor ticket handled in court or in chambers. Ginsberg also involved Judge Ginsberg's outright dismissal, for an attorney who was in his chambers on an unrelated matter, of a citation for failure to obey a traffic-control device. Id. at 546. Judge Ginsberg evidently believed that the city attorney prosecuting the case had a "problem" with the defendant's wife, who was also an attorney, and the dismissal appears to have been, in part, an attempt at retribution against the city attorney. Id. The Panel and Board found that this conduct violated Canon 3A(7), and Ginsberg did not contest this conclusion. Id. at 548. He also did not argue or present any evidence that he simply followed standard procedures in his handling of the matter, as Judge Murphy has in this case.
*365 Although the county or city prosecutor certainly qualifies as an interested party to a petty misdemeanor ticket issued by the county or city, it is apparently routine practice, unobjected to by prosecutors, for minor traffic violations to be handled without prosecutorial appearances in Dakota County. We conclude that the bare fact that Judge Murphy resolved the ticket in chambers without prosecutorial input does not constitute a violation of Canons 2B and 3A(7), Code of Judicial Conduct.
B. Appearance of partiality
Canon 2A, Code of Judicial Conduct, requires a judge to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." "The legal system depends on public confidence in judges, whose power rests in large measure on the ability to command respect for judicial decisions." In re Miera, 426 N.W.2d at 855. Public confidence in the judiciary suffers if the public perceives that, by virtue of their unique access to judges, court employees can obtain preferential treatment for themselves or for their family members. Public confidence in the judiciary suffers further when matters involving court employees or their family members are resolved behind closed doors, even if the disposition would have been the same in open court. See In re Nowell, 293 N.C. 235, 237 S.E.2d 246, 257 (1977) ("The objective observer * * * would surely think he had reasonable cause to believe that those who knew the judge, or knew a deputy sheriff who knew the judge, could receive more favorable treatment than the average traffic offender."); Cynthia Gray, Ticket-Fixing, Jud. Conduct Rep., Summer 2006, at 1, 5-6 (arguing that ticket fixing is a violation of the code of judicial conduct and ought to be discouraged).
The clerk and Judge Murphy offered dramatically different accounts of her presentation of the ticket. The clerk testified that she entered the judge's chambers and announced, "[t]his is my son's ticket. He got a speeding ticket and, instead of him taking the day off of work and missing the pay, and instead of him pleading guilty to it and paying it and it going on his driving record, is there something that you could do?" Judge Murphy testified that the clerk handed her the ticket, he asked her whose it was, and she provided the defendant's name (the defendant and the clerk did not have the same last name). He testified that he did not inquire further into the defendant's identity or the reason why the ticket was before him. He also indicated in his letter to the board and in his testimony that he remembered the incident "pretty well" because it was "unusual" and that the clerk was "somewhat evasive." The panel found that the clerk announced that the ticket belonged to her son, but Judge Murphy was "busy reviewing mail and files" and did not hear her.
We cannot reconcile the panel's finding with the testimony of the clerk and Judge Murphy. Either the clerk was straightforward and announced that the ticket was her son's, or she was "evasive;" she could not have been both. We note that, although the panel made no express credibility determination, it accepted the clerk's testimony that she announced that the ticket belonged to her son. In contrast, despite Judge Murphy's testimony that he remembered the incident well because it was so unusual, the panel's findings did not credit his testimony that he asked to whom the ticket belonged or his testimony that the clerk was evasive.
Perhaps more importantly, the panel only addressed the issue of whether Judge Murphy knew that the ticket had been *366 issued to the clerk's son; it did not address the issue of whether Judge Murphy should have known that the ticket was issued to the son. The latter issue is important because Judge Murphy's handling of the ticket deviated even from the relaxed procedures for petty misdemeanors that are common in Dakota County. Although ex parte, in chambers resolution of petty misdemeanor traffic tickets is not unusual in Dakota County, no one testified that it is common for a Dakota County judge to resolve a ticket without knowing to whom it belongs, why it is before the judge, or what resolution the defendant seeks. Judge Spicer testified that he does not "take representations" from a clerk and that "[n]o clerk will bring you a ticket" in Dakota County without the original ticket with the police officer's notes. Judge Murphy testified that his usual practice is to require an admission to the offense from the defendant before ordering a continuance for dismissal and that people who come to the desk at the courthouse with a ticket typically are not seeking a continuance for dismissal because they "don't know anything about that."
By his own account, Judge Murphy failed to make any meaningful inquiry into the circumstances surrounding an "unusual" request by an "evasive" staff member for an ex parte, in chambers disposition of a ticket. Judge Murphy deviated from standard Dakota County practice when he issued a continuance for dismissal on the ticket without obtaining an admission from the defendant, without verifying that the defendant understood the disposition, without requiring that the defendant or someone representing the defendant be present in the courthouse, and without even knowing who the defendant was. Judge Murphy indicated in his letter to the board that his mistake was "not inquiring further into this matter." We agree and find that the evidence shows, clearly and convincingly, that Judge Murphy should have made an inquiry sufficient to determine that the defendant was the clerk's son. We therefore hold that Judge Murphy's conduct violated Canon 2A, Code of Judicial Conduct, because he did not avoid the appearance of impropriety and did not act in a manner that promotes public confidence in the impartiality of the judiciary.
We must decide what discipline to impose for this violation. The board recommends that Judge Murphy receive a public reprimand, and we adopt this recommendation.
The dissent concludes that Judge Murphy should not be publicly disciplined for his disposition of the traffic ticket. The dissent relies on the panel's factual finding that the clerk announced that the ticket belonged to her son, but Judge Murphy did not hear her. As we have explained, this finding is incompatible with Judge Murphy's own testimony before the panel. Exercising our authority to independently review the record and factual findings, we conclude that this finding cannot possibly be correct.
The dissent agrees with our conclusion that Judge Murphy should have inquired further into the identity of the ticketed driver, and presumably agrees that the failure to make such an inquiry was a violation of Canon 2A, Code of Judicial Conduct. Notwithstanding the argument of the dissent for a private warning, our purpose in imposing judicial discipline is to "restore public confidence in the system and its officers." In re Miera, 426 N.W.2d at 858. We must impose a sanction "designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future." Id. Because Judge Murphy's conduct may have created the impression among the *367 public that court employees and their families may use their access to judges to obtain preferential treatment for traffic violations, we conclude that our obligation to preserve the integrity of the judicial system requires us to issue a public reprimand to Judge Murphy.
Based on the foregoing, it is the order and judgment of this court that Judge Thomas M. Murphy be, and hereby is, publicly reprimanded.
Concurring in part and dissenting in part, ANDERSON, PAUL H. and PAGE, JJ.
ANDERSON, PAUL H., J. (concurring in part and dissenting in part).
I concur with the court's determination that Judge Murphy be publicly reprimanded for his attempt to influence the testimony of a witness in these disciplinary proceedings; but, I disagree with the court's determination to publicly reprimand Judge Murphy for his disposition of the traffic ticket. As I did in Stacey, I rely on the three-member panel's finding that although the clerk said the ticket belonged to her son, Judge Murphy did not hear her. See In re Stacey, 737 N.W.2d 345, at 353-54 No. A06-305 (Minn. 2006) (Anderson, Paul H., J., dissenting). I therefore conclude that the board has failed to prove by the requisite clear and convincing evidence that Judge Murphy in fact knew the ticket he was dismissing had been issued to a family member of a court employee. But I conclude that Judge Murphy should have known that the clerk's request violated county policy, because the circumstances of the clerk's request should have led Judge Murphy to make further inquiry. For the reasons I expressed in Stacey, I conclude that the appropriate discipline for Judge Murphy's conduct with respect to the traffic ticket is a private warning from the Board of Judicial Standards, not a public reprimand from this court. Id. at 354.
PAGE, J. (concurring in part and dissenting in part).
I join in the concurrence and dissent of Justice Paul H. Anderson.
NOTES
[1] Section 169.14 was amended in 2005, but that amendment is not relevant here.
[2] A continuance for dismissal under Minn. R.Crim. P. 27.05 and Minn.Stat. § 609.132 (2006) suspends prosecution for the cited offense for a designated period of time on certain conditions. There is no finding or admission of guilt. If the defendant has met the stated conditions, at the end of the designated period the citation is dismissed. A stay of adjudication, on the other hand, is predicated upon a guilty plea or a finding of guilt. But because the adjudication of the defendant as guilty is stayed upon certain conditions, if the defendant successfully completes the stated conditions there is no criminal conviction. See Minn.Stat. § 152.18 (2006) (describing stays of adjudication for certain first time drug offenders).
[3] The complaint stated that the clerk's son had received apparently preferential treatment of his ticket and that this was "not an isolated incident."
[4] The entire message stated:

[ ], this is Tom Murphy calling. I've called a couple times before and never left a message on the machine. I'm just calling to tell you, you know, [ ], I have no problems with you and, you know, it's the damn board that, uhYou and I were buddies and I hope we still are. I don't have any problem with whatever you say, and, uh, you know, the disposition of that matter would be the same in chambers, at the desk, at the counter, at the court, in the court, uh, wherever, and the damn board is hearing that from everybody. So I just wanted to let you know that, uh, my feeling is that I have no axe to grind with, uh, you [ ]. It's that damn board, who, uh just as ruthless as hell. So that's why I'm gonna callthat's why I wanted to call and tell you.
[5] Canon 1, Code of Judicial Conduct provides:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and personally observe those standards in order to preserve the integrity and independence of the judiciary. The provisions of this Code should be construed and applied to further that objective.
Canon 2A, Code of Judicial Conduct provides:
A judge shall respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Canon 2B, Code of Judicial Conduct provides:
A judge shall not allow family, social, political or other relationships to influence judicial conduct or judgment. A judge shall not lend the prestige of the office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.
Canon 3A(7), Code of Judicial Conduct provides:
A judge shall accord to every person who has a legal interest in a proceeding, or person's lawyer, the right to be heard according to law. A judge shall not initiate, permit or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding, except that:
* * * *
(d) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.
(e) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.
[6] The ABA House of Delegates approved an amended Model Code of Judicial Conduct on February 12, 2007. Under this new code, Canons represent "overarching principles of judicial ethics" and to be disciplined a judge must violate one or more of the numbered Rules that comprise each Canon. ABA Model Code of Judicial Conduct February 2007 at 2, available at http://www.abanet.org/ judicialethics/ABA_MCJC_approved.pdf [hereinafter ABA Model Code]. This is a change from the current code, in which violations of canons themselves are grounds for discipline. Because we reprimand Judge Murphy for conduct that does not promote public confidence in the integrity and impartiality of the judiciary in violation of Canon 2A, Code of Judicial Conduct, which is similar to Rule 1.2 of the new ABA Code, the changes (if accepted in Minnesota), would not affect our decision in this matter. See ABA Model Code at 10.
[7] The record contains no indication that any prosecutor in Dakota County ever complained about the practice.
[8] Finding 30 of the Board's Findings, Conclusions and Recommendations states: "There was no evidence introduced at the hearing showing that any other judge in Dakota County or the First Judicial District had ordered a continuance for dismissal in a traffic case without prosecutorial authorization." This finding, as the Board promptly and responsibly conceded at oral argument, is obviously wrong.
[9] While the desirability of these practices is open to question, we are called on here to evaluate Judge Murphy's conduct, not that of the entire Dakota County district court system.