INQUIRY INTO the CONDUCT OF
The Honorable Timothy
BLAKELY.

No. A08–1445.

Supreme Court of Minnesota.

Sept. 17, 2009.

Douglas A. Kelley, Steven E. Wolter, Kelley & Wolter, P.A., Minneapolis, MN, for Board on Judicial Standards.

Martin A. Cole, Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for Office of Lawyers Professional Responsibility.

Timothy L. Blakely, Eagan, MN, pro se; and Thomas M. Kelly, Kelly & Jacobson, Minneapolis, MN, for the Honorable Timothy L. Blakely.

## OPINION

PER CURIAM.

The Honorable Timothy Blakely, a judge in the First Judicial District, challenges the recommendation of the Minnesota Board on Judicial Standards ("Board") that he be removed from office as a result of his actions in negotiating and obtaining

a substantial legal fee reduction from his personal attorney while contemporaneously appointing her to provide mediation or related services in matters pending before him. The fact finding panel appointed to conduct a hearing on the charges recommended censure and suspension from judicial duties for 6 months without pay. The Office of Lawyers Professional Responsibility recommends a suspension from the practice of law for 6 months if we accept the Board's recommendation of removal. Judge Blakely asks the court to reject any sanction exceeding censure and asserts that lawyer discipline in addition to judicial discipline would be excessive. We conclude that the appropriate judicial discipline is censure and suspension from judicial duties for 6 months without pay. We further conclude that the appropriate attorney discipline is a public reprimand.

Judge Blakely was elected as a judge for Minnesota's First Judicial District in 1998. He was reelected to a second 6–year term in 2004. His current term expires in January 2011.

In October 2002, Judge Blakely retained William Haugh of the St. Paul law firm of Collins, Buckley, Sauntry & Haugh, PLLP ("CBSH") to represent him in dissolution proceedings. When he retained CBSH, Judge Blakely agreed to pay the "usual hourly rate" charged by CBSH attorneys. At the time, Judge Blakely anticipated that his divorce could be resolved quickly and that his legal fees would be minimal. Judge Blakely's case failed to settle, however, and Christine Stroemer of CBSH took over as the lead attorney in December 2002. Judge Blakely incurred substantial legal fees during the divorce proceedings and was not able to keep current with his bill.

In addition to representing parties in divorce and other proceedings, CBSH provides mediation services. Between 2000 and 2002, before Judge Blakely retained CBSH to represent him in his divorce, CBSH Mediation Services made a presentation to the judges in the First Judicial District, offering mediation services in family court dissolution actions. Judge Blakely attended the presentation. Although Judge Blakely was impressed with CBSH, his first mediation appointment of CBSH was not until December 2003, when he appointed Stroemer to mediate a Scott County dissolution action. At the time of the appointment, Stroemer was representing Judge Blakely in his divorce, and Judge Blakely owed CBSH more than $42,000 in legal fees. Over the course of the next three and a half years, Judge Blakely appointed Stroemer as a mediator or third-party neutral in another sixteen cases.

In addition to the mediation appointments, Judge Blakely referred people he knew to Stroemer for direct representation. Judge Blakely referred his personal tax accountant to Stroemer for representation in her divorce. The case ultimately generated significant fees for CBSH. While not aware of the exact amount, Judge Blakely believed the fees were similar to his own. Judge Blakely and his second wife also referred families using the wife's daycare business to Stroemer for representation.

By the time the final dissolution decree was entered in his divorce in September 2004, Judge Blakely had made payments totaling $8,640 to CBSH, and owed approximately $98,000 in unpaid fees. Although Stroemer had agreed to accept monthly payments toward the bill, after the case was concluded she advised Judge Blakely that he needed "to make substantial payments to this office." Stroemer offered to work with Judge Blakely to establish a reasonable payment plan, but also stressed her inability to continue car-

rying such a large outstanding balance on CBSH's books.

On February 16, 2005, Judge Blakely called Stroemer to protest the interest CBSH was assessing on the unpaid balance on his account. Stroemer responded by e-mail, defending CBSH's ability to charge interest. She also stated "[Q]uite frankly, when the dissolution ends, the client is to pay the outstanding balance . . . with[in] 30 days." Nonetheless, Stroemer agreed to suspend the interest as long as Judge Blakely was making reasonable, regular payments. After acknowledging Judge Blakely's financial situation, Stroemer thanked him for the mediation appointments, stating in her e-mail message, "I DO want to thank you for the referrals and certainly appreciate the work. I'll do my best to get those cases resolved and off the court calendar."

On October 19, 2005, Judge Blakely advised Stroemer by e-mail that he was "in a serious bind." He asked Stroemer to consider "a compromise lump sum payment of fees." He expressed hope that she would agree to accept the proceeds from the sale of his home "and forego any more fees." He acknowledged his request would result in a deep discount, but reminded her about the referrals. He stated:

I recognize this may not be a small compromise in your view. On the other hand, a sizeable lump sum now may be preferable to very long-term payments. There is also very substantial past, and future, benefit to you from significant business referrals we have made in excess of the compromise we are asking for.

Judge Blakely testified before the fact finding panel that the "business referrals we have made" referred to the direct representation referrals that both he and his second wife had made. He denied that he was referring in any way to the mediation appointments.

Stroemer responded to Judge Blakely's offer by e-mail 2 days later, expressed her willingness to consider a settlement, and again thanked him for the mediation referrals. She stated:

Tim, I would certainly consider a compromised [sic] lump sum payment in lieu of future small monthly payments. I certainly appreciate the mediation referrals you have sent my way and hope that you continue to do so.

Despite his subsequent claim that there was no connection between the mediation referrals and the negotiation of a discount on his legal bill, Judge Blakely did nothing to respond to Stroemer's statement.

On February 1, 2006, Judge Blakely informed Stroemer of a possible purchase offer on his home and pledged to pay "[e]very dime" of an expected $30,000–$31,000 in net proceeds to settle his $94,545.62 bill. Stroemer responded that he was asking her to "forego over $60,000 in earned fees." She stated:

Nonetheless, it is my hope that we continue a good relationship and that you continue to refer cases to me to assist in mediation/arbitration of family court matters. I have appreciated the referrals in the past. Thus, I will accept no less than $31,000 as a final payment on the account, to be paid at the time of the house closing.

Once again, Judge Blakely did not respond to Stroemer's statement regarding the mediation referrals.

On April 4, 2006, Stroemer accepted Judge Blakely's offer of settlement. Judge Blakely paid CBSH a lump sum of $31,982.84 from the sale of his home to settle his outstanding bill of $94,545.62. Ultimately, Judge Blakely paid $45,372 out of a total bill of $109,501; CBSH wrote off $64,128. On the day of the settlement,

Stroemer sent Judge Blakely an e-mail that addressed the compromise. She stated:

> FYI, I had to do a [sic] lot of explaining to my partners as to the reasoning for writing off over $60,000 in your legal fees. I hope you understand that this was a very difficult decision for me to make. It affected my income. I do hope that you continue to recognize my legal abilities and continue to refer mediation cases to me.

Judge Blakely responded by e-mail that he was "deeply appreciative" of Stroemer's compromise, but again did not disabuse her of any notion that there was a connection between the mediation referrals and the discounted bill.

In 2007, Judge Blakely's former wife filed a complaint with the Board on Judicial Standards accusing Judge Blakely of misconduct. She made a number of allegations in the complaint, including the allegation that CBSH had given Judge Blakely "special financial arrangements." In his initial response to the complaint, Judge Blakely claimed that the allegations were "groundless." He characterized the allegation concerning a preferential fee arrangement with CBSH as "puzzling" and explained that he had experienced "tremendous financial hardship," which left him unable to pay his legal bill.

After reviewing his communications with Stroemer, Judge Blakely sent the Board a supplemental response which acknowledged that his reference to business referrals in his October 19, 2005, e-mail while negotiating a fee reduction with Stroemer created "at the very least" an appearance of impropriety. His letter stated:

> I now also see that as a judge, I should not have mentioned my ability to continue to direct "business referrals" to [the firm] in the context of a negotiation over the fees I owed to them, since this mention at the least raises the issue of the "appearance of impropriety" and might as well constitute the use of my office to "advance ... a private interest" in a manner to which I do not believe my former wife was alluding to in her complaint.

> I don't recall that this was my intention at the time that I wrote the email, but I clearly decided to include these words and a reasonable inference from their use could be that I was offering a *quid pro quo*.[1]

Judge Blakely later provided a written statement to the Board in which he asserted that his reference to "business referrals" during the legal fee discussions with Stroemer was to "private referrals" of daycare contacts and friends and not mediation appointments. He denied that he had engaged in any improper quid pro quo agreement.

The Board filed a formal complaint against Judge Blakely, which charged him with violating the Minnesota Code of Judicial Conduct by negotiating and obtaining a substantial discount on legal fees in his personal divorce case while appointing his divorce attorney to provide mediation or related services in family court matters over which he presided in his official capacity. We appointed a three-member fact finding panel to conduct a hearing on the charges.

---

1. The Latin phrase "quid pro quo" means "something for something," or, more specifically, "[a]n action or thing that is exchanged for another action or thing of more or less equal value." *Black's Law Dictionary* 1282 (8th ed. 2004). Black's Law Dictionary provides an especially relevant example: "[T]he discount was given as a quid pro quo for the extra business." *Id.*

The panel heard 2 days of testimony and arguments. Judge Blakely and Stroemer both testified that there was no bargain made to exchange mediation and arbitration appointments for a fee discount. Stroemer and another CBSH partner testified that CBSH agreed to the reduction of Judge Blakely's legal bill because Judge Blakely had no money and getting the proceeds from the sale of his house was preferable to getting monthly payments from him for years to come. They also testified that it was not uncommon for CBSH to accept some discount of legal fees in exchange for an immediate cash payment, although they acknowledged that this was one of the largest discounts CBSH had ever agreed to.

For his part, Judge Blakely testified that he did not even recognize the possible appearance of a connection between the negotiated fee reduction and his appointments until he re-read the e-mails while responding to the Board. He maintained that only then did he realize that there might be an appearance of impropriety in the exchange of e-mails.

Following the public hearing, the panel found that the Board established by clear and convincing evidence that Judge Blakely's actions in making mediation appointments while negotiating a substantial legal fee reduction in his personal divorce case constituted conduct prejudicial to the administration of justice and violated several Canons of the Minnesota Code of Judicial Conduct (2008).[2] In summary, the panel found that Judge Blakely:

- Created an appearance of impropriety by allowing his personal relationship with Stroemer to influence his judicial conduct in violation of Canon 2A, which provides that a judge shall act "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

- Used his judicial office to advance his private interests in violation of Canon 2B, which provides that a judge shall not allow personal "relationships to influence judicial conduct or judgment"; "shall not lend the prestige of the office to advance the private interests of the judge or others"; and shall not "convey or permit others to convey the impression that they are in a special position to influence the judge."

- Conducted extra-judicial activities in violation of Canon 4A, which provides that "[a] judge shall conduct all extra-judicial activities so that they do not: (1) cast reasonable doubt on the judge's capacity to act impartially as a judge; (2) demean the judicial office; or (3) interfere with the proper performance of judicial duties."

- Engaged in financial or business dealings that may reasonably be perceived to have exploited his position in violation of Canon 4D(1), which provides that "[a] judge shall not engage in financial and business dealings" that "may reasonably be perceived to exploit the judge's judicial position."

- Accepted a gift, bequest, favor or loan from his former attorney in connection with the reduction of his personal fee obligation in violation of Canon 4D(5), which provides that a judge cannot accept a benefit that could "reasonably be perceived as intended to influence the judge in the performance of judicial duties."

The panel found that Judge Blakely did not inform the parties in any of the media-

---

2. We have adopted a new Code of Judicial Conduct, which became effective on July 1, 2009, and applies to all conduct occurring on or after the effective date. Unless otherwise noted, all references here are to the Code in effect at the time of Judge Blakely's conduct.

tion cases that Stroemer was his personal attorney, that he owed her firm substantial legal fees, or that his bill was ultimately reduced.[3] The panel also found that Judge Blakely never disabused Stroemer of any belief that there was a link between the referrals and the reduction of his bill. The panel recommended a sanction of censure and suspension from judicial duties for 6 months without pay.

The full Board considered the record developed by the panel, and submitted its recommendation to our court. The Board voted unanimously to adopt the panel's factual findings "without substantial revision." The Board also agreed that the evidence clearly established that Judge Blakely's conduct violated the Code of Judicial Conduct. With two members dissenting, the Board recommended that Judge Blakely be removed from office, concluding that removal is the only sanction that will restore public confidence in the judiciary. The dissenting members believed the Board should accept the panel recommendation.

In light of the Board's recommendation for removal, pursuant to statute and rule, we issued an order suspending Judge Blakely with pay, pending a final order in this matter. *See* Minn.Stat. § 490A.02, subd. 1 (2008), and Rule 14(b), Rules of the Board on Judicial Standards (2008).[4] After the Board made its recommendation of removal, the Lawyers Professional Responsibility Board ("LPRB") made a recommendation that Judge Blakely also be disciplined as a lawyer. *See* Rule 13(g), Rules of Board on Judicial Standards (1996) (providing that when Board on Judi-

cial Standards has recommended removal of a judge, the LPRB is authorized to make a recommendation as to the appropriate lawyer discipline).

■ We first consider the issue of judicial discipline. Grounds for judicial discipline include "[c]onduct prejudicial to the administration of justice that brings the judicial office into disrepute" and "[c]onduct that constitutes a violation of the Code of Judicial Conduct or Professional Responsibility." Rule 4(a)(5), (6), Rules of Board on Judicial Standards. To sustain its charges, the Board must prove by clear and convincing evidence that the judge engaged in misconduct. Rule 10(c)(2), Rules of Board on Judicial Standards; *In re Miera*, 426 N.W.2d 850, 853 (Minn.1988). Clear and convincing evidence requires that the truth of the facts asserted be "highly probable." *Miera*, 426 N.W.2d at 853. The function of the fact finding panel "is to develop the most complete record possible" for later review by the Board and this court. *In re Murphy*, 737 N.W.2d 355, 361 (Minn.2007).

■ We agree with the panel that Judge Blakely's actions constituted conduct prejudicial to the administration of justice that brings the judicial office into disrepute. We also agree that Judge Blakely's actions violated Canons 1, 2 A, 2 B, 4 A, 4 D(1)(a) and 4 D(5) of the Code of Judicial Conduct. Accordingly, there is no question that substantial grounds for judicial discipline are present here. *See* Rule 4, Rules of Board on Judicial Standards.

■ The primary issue before us is the level of judicial discipline warranted by

---

**3.** The Board's counsel acknowledged at oral argument that there is no evidence in the record to indicate that the mediation services provided by Stroemer, and the fees charged, were in any other way inappropriate.

**4.** We recently amended the Rules of the Board on Judicial Standards. The amendments became effective on July 1, 2009. Unless otherwise noted, all references to these rules are to the rules in effect before July 1, 2009.

Judge Blakely's misconduct. The recommendations of the panel, the Board, and Judge Blakely cover a wide range of possible sanctions. The panel recommends censure and 6–month suspension without pay; the Board recommends removal from office; and Judge Blakely urges us to impose a sanction no greater than censure.

We afford no particular deference to the recommendations of the panel or the Board. We may accept, reject or modify in whole or in part the recommendations. *Murphy*, 737 N.W.2d at 361; Rule 13(f), Rules of Board on Judicial Standards. While we independently review the record of the proceedings, we do so with the panel's findings and recommendation concerning the proposed discipline in mind. *Cf. Murphy*, 737 N.W.2d at 361 (noting that we are sensitive "to the fact that the panel had the opportunity to view the witnesses as they testified").

The purpose of judicial discipline is not to punish the offending judge, but to protect the public by preserving the integrity of the judicial system. *Miera*, 426 N.W.2d at 858. We have explained that "[t]he sanction must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future." *Id.* "We act not to punish the wrongdoer but to restore public confidence in the system and its officers." *Id.*

Although the Board acknowledges that removal, "the harshest available sanction," has been reserved "for cases involving serious misconduct or an extended course of wrongdoing," the Board argues that removal is "the only adequate means of restoring public confidence in the integrity of the judicial system and ensuring that no similar ethical breaches will reoccur." In support of its argument, the Board cites "numerous aggravating factors," including

the intentional character of Judge Blakely's actions, "his lack of understanding or appreciation for the governing ethical rules," his lack of remorse, and "his incredible hearing testimony."

Since 1972, when a constitutional amendment and statute first authorized the removal of judges for conduct prejudicial to the administration of justice, we have removed only three judges from office: Harvey Ginsberg, Robert Crane Winton, and Jack F.C. Gillard. *In re Ginsberg*, 690 N.W.2d 539 (Minn.2004), involved significant misconduct that included "actions taken in or directly related to Judge Ginsberg's role as a judge," as well as "two incidents of criminal conduct he committed outside that role." *Id.* at 549. In one of the criminal incidents, Judge Ginsberg assaulted a 14–year–old boy and accused him of stealing a bicycle from the judge's son. *Id.* at 547. The boy denied involvement and threatened to call the police. *Id.* Judge Ginsberg responded by saying, "Go ahead, I'm a judge and I'll have you charged with a felony." *Id. In re Winton*, 350 N.W.2d 337, 338 (Minn.1984), the record established an extensive course of misconduct that involved soliciting and engaging in prostitution with young male prostitutes. *In re Gillard*, 271 N.W.2d 785, 802–05 (Minn.1978), involved numerous incidents of grave professional misconduct—including severe neglect of lawsuits, dishonesty in communications with clients, and failure to disclose conflicts of interest—that the judge committed as an attorney before he was appointed to the bench.

In other cases, we have rejected the Board's recommendation for removal and imposed less severe sanctions. *See Miera*, 426 N.W.2d at 852–53 (rejecting removal in favor of censure and suspension without pay for one year where misconduct consisted of judge's abuse of official position by making unsolicited advances to a close

personal assistant and judge's intemperate comments about judicial colleagues); *In re Kirby*, 354 N.W.2d 410, 421 (Minn.1984) (favoring censure over removal where misconduct consisted of judge's discourteous treatment of female attorneys, public intoxication, conducting judicial business with alcohol on his breath, and habitual tardiness).

According to the Board, "[t]his case turns on Judge Blakely's pattern of conferring paid judicial appointments on an attorney to whom he personally owed money." Although the Board suggests that the evidence establishes that Judge Blakely and Stroemer struck an actual quid pro quo, the Board argues that Judge Blakely's conduct, at the very minimum, creates an appearance of a quid pro quo, which "is equally damaging to public faith in the legal system."

The Board notes that there are no Minnesota cases involving "a pattern of judicial appointments flowing from an actual or apparent quid pro quo agreement." According to the Board, the closest Minnesota case is *In re Anderson*, 312 Minn. 442, 445, 252 N.W.2d 592, 593 (1977), where the judge had borrowed $1,000 from two different lawyers who appeared before him as counsel in contested litigation. We indicated that the loans between the judge and members of the bar "deserve severe and explicit censure." *Id.* at 447, 252 N.W.2d at 594. We ultimately determined that a suspension without pay for three months was "an acceptable sanction" for the judicial misconduct involving the loans, as well as the judge's failure to file informational reports and his failure to promptly decide matters. *Id.* at 444–46, 252 N.W.2d at 593–94, 595.

Judge Blakely denies that he engaged in any intentional wrongdoing and observes that the panel made no finding of quid pro quo intent. Judge Blakely claims that he simply failed to spot the issue when he and Stroemer were exchanging e-mail messages, and asserts that he has "readily, and regretfully, admitted his failure." Judge Blakely also asks us to consider the totality of the circumstances, including his position as a judge assigned to high-volume, high-conflict, family law calendars "with the need to order compliance with the Rule 114 mediation process."

Judge Blakely relies on a New York case in arguing for a sanction no greater than censure, *In re Lebedeff* (N.Y. Comm'n on Judicial Conduct Nov. 5, 2003). In *Lebedeff,* the New York Commission on Judicial Conduct determined that censure was the appropriate sanction for a judge who appointed her friend and personal accountant as a fiduciary in cases generating significant fees over a four-year period during which time the accountant prepared the judge's tax returns at no charge. Although there was no evidence of a quid pro quo in *Lebedeff*—the judge's failure to pay for the accounting services was attributed to the accountant's sloppy billing practices and a computer glitch—the Commission concluded that the circumstances created "the appearance of a serious breach of judicial ethics." According to Judge Blakely, "The *Lebedeff* rationale serves the purposes of judicial discipline while also recognizing the immense implications of public censure to a sitting Judge." [5]

---

5. Judge Blakely also argues that the court should not impose a sanction more severe than the sanction the Board had proposed before the hearing took place. In the appendix to his brief, Judge Blakely included a draft stipulation for final disposition submitted to him by the Board during settlement negotiations, as well as some of his e-mail communications with the Executive Director of the Board. The Board has filed a motion to strike these materials and the portions of Judge Blakely's brief that advance arguments

After careful review of the entire record, we conclude that Judge Blakely's actions warrant censure and suspension of judicial duties for 6 months without pay. The panel's findings bring to light an extremely disturbing course of events. There is no dispute that CBSH is highly qualified to provide mediation services, or that CBSH is well regarded in the area of family law. Nonetheless, despite learning of CBSH's mediation practice in 2000, Judge Blakely did not appoint CBSH to mediate any family law cases until December 2, 2003, over 1 year after he retained CBSH to represent him in his own divorce—at a time when he owed CBSH over $42,000 in legal fees.

Judge Blakely's first mediation appointment to CBSH took place before there was any discussion of a discount of his legal bill or the referral of any non-mediation work to CBSH. But shortly after this appointment, Stroemer advised Judge Blakely that he had incurred substantial legal fees and "really need[ed]" to set up a payment plan so she could be assured she would get paid. Over the course of the next three and a half years, Judge Blakely continued to make mediation appointments to Stroemer, both before and after his divorce was finalized.

As noted, while Judge Blakely claims that "business referrals" meant the direct representation referrals of his accountant and daycare contacts, when Stroemer responded to Judge Blakely's offer to reduce the bill, she specifically thanked him for "the mediation referrals." Although she denied a bargained quid pro quo, the communications between Judge Blakely and Stroemer reveal that, in Stroemer's mind, "business referrals" were not limited to the direct representation referrals. In February 2006, responding to a communication from Judge Blakely about the settlement, Stroemer made a specific reference to the mediation referrals, stating that although he was asking her to "forego over $60,000 in earned fees," she hoped to maintain a good relationship with him and hoped that he would continue to refer "mediation/arbitration" cases to her. In April 2006, on the day the settlement was finalized, Stroemer pointed out that the settlement had affected her income and stated that she hoped Judge Blakely would "continue to refer mediation cases" to her. Judge Blakely acknowledges that he never corrected Stroemer when she thanked him for the mediation referrals or mentioned the mediation referrals in the context of the reduction of his legal bill.

Notwithstanding our belief that Judge Blakely's misconduct warrants a severe sanction, we decline to accept the Board's recommendation that Judge Blakely be removed from office. Both Stroemer and Judge Blakely denied a quid pro quo. Stroemer testified that her reasons for discounting the legal fees had "nothing to do with" the referrals—the discount was based on Judge Blakely's inability to pay the bill and the benefit to her firm from receiving an immediate lump-sum payment rather than small monthly payments over the next 10 years; it was not uncommon for the firm to accept some discount of fees and the firm had made these same

based on these materials. The Board argues that these materials are outside the record on appeal. The Board also argues that our court has "a longstanding policy precluding the use of unsuccessful pretrial settlement negotiations in later proceedings." *See* Minn. R. Evid. 408. We grant the Board's motion to strike. Settlement discussions between Judge Blakely and the Board are not only outside the record on appeal—they are irrelevant in the context of this case. Judge Blakely provides no legal support for his position that the Board's recommendation for judicial discipline is constrained by the level of sanctions the Board was willing to accept before the hearing.

types of arrangements with other clients. Stroemer claimed she was simply expressing her appreciation for the referrals in closing and did not in her mind link the referrals to the discount. Judge Blakely testified that he was in a serious financial bind and offered CBSH the only asset he had—the equity in his home—and he made the referrals not because of the discount but because of Stroemer's reputation and skill in mediating family-law conflicts.

The panel apparently accepted that testimony. The panel did not find that Judge Blakely made the mediation referrals because of the fee reduction, and the panel did not find that CBSH agreed to the fee reduction because of the mediation referrals; the panel stopped short of finding an actual quid pro quo.[6] While we are not bound to defer to the findings of the panel on this point, the panel heard the testimony and was in a position to assess the credibility of the witnesses, and the panel's findings inform our own determination that the Board did not establish by clear and convincing evidence an actual quid pro quo.

Despite the absence of a specific finding of quid pro quo, Judge Blakely's actions reflect a serious lack of judgment. Acting in his official capacity as a judge, Judge Blakely ordered parties in family court matters to use the mediation services of his personal attorney, at their own expense, without informing them that Stroemer represented him in his divorce, that he owed her firm substantial legal fees, or that he had negotiated and obtained a substantial discount of his legal bill.

We also are troubled greatly by Judge Blakely's continued lack of insight into his misconduct. Judge Blakely claims that he has "squarely admitted the appearance of impropriety issue," but the panel found that Judge Blakely had "retreated from his prior admissions to the Board about creating an appearance of impropriety"[7] and argues here that there remains "a debate" over "the 'appearance' standard in light of the unique facts of this case." At oral argument, Judge Blakely persisted in his claim that it is unclear that his conduct was actually improper.

We do not share Judge Blakely's uncertainty about the standards that apply to his conduct. The Canons of Judicial Conduct clearly provide that a judge cannot allow his personal relationships to influ-

---

**6.** The panel found that Judge Blakely engaged in conduct prejudicial to the administration of justice and violated Canons 1, 2 A, 2 B, 4 A, 4 D(1)(a) and 4 D(5), yet based its findings on a temporal connection between the discount of Judge Blakely's legal bill and the mediation appointments, not a cause-and-effect connection. For example, the panel found that Judge Blakely negotiated and obtained a substantial fee reduction from his personal attorney "at the same time" he was appointing her to provide mediation or related services to litigants appearing before him. Similarly, the panel found that Judge Blakely had improperly negotiated and obtained a substantial discount on the legal fees owed to his personal divorce attorney "while" appointing her to provide mediation or related services.

**7.** Judge Blakely acknowledged that his reference to "business referrals" while negotiating a fee reduction with Stroemer "raises the question" of whether he was offering a quid pro quo, yet asserted at the hearing that a reasonable, informed person would not infer a quid pro quo:

> I don't believe it would be a reasonable inference to a fully informed person. The question is, is it a fully informed person or some guy standing in the courtroom who doesn't know anything about what we do for a living[?]

The panel stated: "This explanation is hardly credible, however, given his acknowledgement that there was at least a reasonable inference of such an arrangement and his repeated failures to advise Ms. Stroemer that there was no *quid pro quo*."

ence his judicial conduct or use the prestige of his office to advance his own personal interests. *See* Canons 2 B, 4 D, Code of Judicial Conduct. Judge Blakely's actions created a perception that he was using his position as a judge to secure a discount on his legal fees by making mediation appointments to his attorney. Judge Blakely's actions cast doubt on the integrity and impartiality of the judiciary. *See* Canons 1, 2 A, 4 A, Code of Judicial Conduct. Therefore, in view of the misconduct that occurred here, censure, standing alone, would not be sufficient to restore public confidence in the judiciary.

At the same time, although extremely serious, Judge Blakely's misconduct is not as egregious as the misconduct in the three cases in which we have exercised our power to remove a judge. *See In re Ginsberg,* 690 N.W.2d 539 (Minn.2004); *In re Winton,* 350 N.W.2d 337 (Minn.1984); *In re Gillard,* 271 N.W.2d 785 (Minn.1978). Considering the totality of the circumstances, we conclude that a sanction of censure and suspension from judicial duties for 6 months without pay is sufficient to restore public confidence in the judicial system. By this sanction, we convey our lack of tolerance for a judge's actions that can reasonably be perceived as allowing a personal relationship to influence judicial conduct.

Under Rule 13(g), Rules of Board on Judicial Standards, when the Board on Judicial Standards has recommended the removal of a judge, the LPRB is authorized to make a recommendation as to the appropriate lawyer discipline. Considering lawyer discipline in the context of a judicial discipline proceeding "is appropriate both for purposes of judicial economy and to avoid the imposition of additional stress and costs of a separate lawyer discipline proceeding on the respondent judge/lawyer." *In re Ginsberg,*

690 N.W.2d at 555. In this case, the LPRB asserts that "[t]he length of the suspension to be imposed will be affected by the judicial discipline"; if we were to remove Judge Blakely from judicial office, the LPRB recommends a suspension from the practice of law for 6 months. Judge Blakely asserts that the imposition of any lawyer discipline would be "excessive and unnecessary piling on in this case."

When weighing lawyer discipline in a judicial discipline proceeding, we have stressed that "the lawyer discipline issue must receive independent consideration," observing that "the standard of conduct imposed on an individual as a judge is higher than the standard imposed on lawyers." *Ginsberg,* 690 N.W.2d at 555.

As is the case with judicial discipline, lawyer discipline is not intended to punish. Rather, the purpose of lawyer discipline is to guard the administration of justice and to protect the courts, the legal profession, and the public. In determining appropriate discipline, we consider the nature of the misconduct, the cumulative weight of the disciplinary violations, the harm to the public, and the harm to the legal profession, as well as any mitigating or aggravating circumstances. We look to cases involving similar misconduct to assess the appropriate discipline.

*Id.* (citations omitted) (internal quotation marks omitted). In the two cases identified by the LPRB in which lawyer discipline was imposed as part of a judicial discipline proceeding—the cases involving Judge Harvey Ginsberg and Judge Alberto Miera—the judicial discipline was more severe than the lawyer discipline. *Ginsberg,* 690 N.W.2d at 551, 556; *In re Miera,* 426 N.W.2d 850, 859 (Minn.1988). Judge Ginsberg was removed from office and suspended for 1 year as an attorney. *Ginsberg,* 690 N.W.2d at 551, 556 (stating that

the suspension was to be followed by transfer to disability inactive status). Judge Miera was suspended for 1 year as a judge and publicly reprimanded as an attorney. *Miera,* 426 N.W.2d at 859.

Under Rule 8.4(d) of the Minnesota Rules of Professional Conduct, it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." The LPRB asserts that Judge Blakely's mediation appointments "called into question the integrity and even-handed treatment of parties before him." The LPRB argues that Judge Blakely's conduct in this matter "should be deemed to have violated Rule 8.4(d)" and "warrants substantial discipline."

We conclude that Judge Blakely's actions in negotiating and obtaining a substantial legal fee reduction from his personal attorney while contemporaneously appointing the attorney to provide mediation or related services violated Rule 8.4(d) and warrant a public reprimand. If, however, Judge Blakely ceases to be a judge before his term of judicial suspension ends, then Judge Blakely will be suspended from the practice of law for a term equivalent to the balance of his judicial suspension.[8]

Judge Timothy Blakely is hereby censured for judicial misconduct and suspended from judicial office without pay for 6 months. He is also publicly reprimanded as an attorney.

PAGE, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring in part and dissenting in part).

I concur in part and respectfully dissent in part. I agree with the majority that a public reprimand as an attorney is war-

ranted for Judge Blakely, and if Judge Blakely ceases to be a judge before his term of judicial suspension ends, then he is to be suspended from the practice of law for a term equivalent to the balance of his judicial suspension.

While I agree with the majority's analysis of the facts and the law of this case, I disagree with the sanction it imposes. The majority concluded that in consideration of the totality of the circumstances, the appropriate sanction for Judge Blakely is censure and suspension from judicial duties without pay for 6 months. I conclude that Judge Blakely's conduct warrants a more severe sanction. A more appropriate sanction for Judge Blakely's conduct is censure and suspension from judicial duties without pay for a period of time commencing with the date of this opinion and ending on June 30, 2010.

---

8. Under Rule 3.10, Minnesota Code of Judicial Conduct (eff. July 1, 2009), a judge may not practice law.